REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1917

September Term, 2015

CLEANWATER LINGANORE, INC., *ET AL*.

v.

FREDERICK COUNTY, MARYLAND, *ET AL*.

Meredith,
Nazarian,
Harrell, Glenn T., Jr.
    (Senior Judge, Specially Assigned),

JJ.

Opinion by Harrell, J.

Filed: December 28, 2016

How many angels can dance on the head of a pin? This ancient metaphor, conceived originally as a mock example used to discredit medieval scholastic philosophy, but deployed here with non-satirical intent, is an apt segue into this opinion. Based on the parties' positions regarding the flagship question in the present case, we imagine the answer Appellants would give to the philosophical query would be "one," while Appellees would respond likely with "a lot more than that."

Appellees, Eugene B. Casey Foundation (Casey) and Frederick County, Maryland (the County), entered into a Development Rights and Responsibilities Agreement (DRRA) in October 2014, following its approval by the Board of County Commissioners for Frederick County (BOCC), to facilitate the development of Casey's 634 acre property in Frederick County. Concurrent with the approval and execution of the DRRA, the BOCC approved Casey's rezoning application, changing the zoning of the property from agricultural to planned unit development (PUD).

Appellants, led by Cleanwater Linganore, Inc. (CLI),[1] appeal these BOCC actions. CLI argues first that the DRRA includes unlawfully broad language that purports to "freeze" local laws beyond those authorized by Md. Code, Land Use Art. (LU), § 7-304 (2012, 2016 Supp.), which describes the field as "the local laws, rules, regulations, and policies governing the use, density, or intensity of the real property subject to an agreement." Second, CLI contends that the BOCC approved erroneously Casey's rezoning

---

[1] Appellants include Cleanwater Linganore, Inc., Mary E. Smith, Stephanie Cacopardo, Betty Ward, and Jerry Ward. We may refer collectively to Appellants as "CLI" on occasion.

application because it failed to make certain of the supporting factual findings required for the PUD zone by the Frederick County Code (FCC). We conclude that the General Assembly intended a broader interpretation of the DRRA Act's "freeze" provision than CLI imagines and that the BOCC made all required factual findings to justify granting the rezoning. Accordingly, we hold that the BOCC's approval, and the County's execution, of the DRRA, and the BOCC's grant of the rezoning, are supported by substantial evidence and free of legal error.

### Facts and Legal Proceedings[2]

The Casey property consists of 634 acres located in Frederick County's New Market Planning Region (NMPR). From 1972 to 2008, the property was zoned for Planned Unit Development (PUD), designated for low density residential (LDR) development, and located in a community growth area (CGA). In 2008, the then-members of the BOCC downzoned much of the NMPR, including the Casey property, to the Agricultural Zoning District. Additionally, it removed the Casey property's CGA status as well as its recommended LDR designation on the County's Comprehensive Plan Land Use Map, replacing the latter with a designation for agricultural land use.

In 2012, as a part of a Comprehensive Planning and Zoning Review, a newly-constituted BOCC restored the Casey property's CGA status and amended the Land Use Map to reinstate its recommended LDR designation. Because a PUD is a floating zone for

---

[2] For a primer in the meaning of a number of the technical planning and zoning terms and processes mentioned in this opinion, see *Cnty. Council of Prince George's Cnty. v. Zimmer Dev. Co.*, 444 Md. 490, 120 A.3d 677 (2015).

2

which no individual rezoning application had been filed or prosecuted yet to the degree required by the zoning ordinance, the BOCC could not approve at that time Casey's desired rezoning during its Comprehensive Plan and rezoning process. Accordingly, Casey submitted a piecemeal rezoning application for the PUD zone, pursuant to FCC §§ 1-19-3.110, Zoning Map Amendments, and 1-19-10.500, Planned Development Districts.

The County Planning Commission reviewed Casey's rezoning application and recommended approval to the BOCC. The BOCC considered the application at a public hearing on 15 July 2014. The Planning Staff Report (Staff Report) opined that, in the staff's view, the application conformed to all applicable legal standards. Casey presented several expert witnesses who testified to the rezoning application's consistency with the Staff Report and the Comprehensive Plan. During the hearing, Appellants' counsel argued that the rezoning application relied on land use maps adopted improperly and that the BOCC failed to contemplate adequately population projections. The BOCC rejected these arguments and approved the rezoning by Ordinance No. 14-20-675 on 23 October 2014.

As a companion matter, Casey petitioned the BOCC, anticipating hoped-for favorable action on its rezoning application, for the negotiation of a DRRA between itself and Frederick County. DRRAs generally are bargained-for agreements between property owners/developers and local jurisdictions that, among other things, provide for "freezing," as of the date of the agreement, the application of certain extant local laws and regulations during a fixed period of time coinciding typically with the estimated build-out of the

3

proposed development, as long as the period does not exceed the statutory "cap."[3]

Obtaining forbearance of the application of subsequent changes in relevant local laws

provides certainty and stability to developers, whose projects may take many years to

complete and/or sell-off or lease. Local governments derive, in return, negotiated greater

public benefits than may be attained through typical governmental exactions or conditions

of development approvals. To determine whether to approve the Casey-County DRRA, the

BOCC held a public hearing on 21 August 2014. Casey presented expert testimony in

support of the DRRA. The Board voted to approve of the DRRA, which was executed on

23 October 2014 and recorded in the County land records.

CLI petitioned the Circuit Court for Frederick County for judicial review of the

BOCC's approval, and the County's execution, of the DRRA and the rezoning. Finding

both actions legal and supported by substantial evidence in the record, the court affirmed

the actions on 9 October 2015.[4] CLI appealed timely to the Court of Special Appeals.

**Questions Presented**

---

[3] Maryland enacted its development rights and responsibilities agreement (DRRA) statute in 1995. Md. Code, Art. 66B, § 13.01. After several non-substantive revisions, including recodification in 2012, the law remains substantially the same today. Md. Code, Land Use Art. (LU), §§ 7-301–7-307 (2012, 2016 Supp.). LU § 7-301(b) defines a DRRA as "an agreement between a local governing body and a person having a legal or equitable interest in real property to establish conditions under which development may proceed for a specified time."

[4] The circuit court reviewed also the BOCC's approval of the Casey Adequate Public Facilities Ordinance Letter of Understanding, an action not contested in this appeal.

Appellants present essentially two questions for appellate review:[5]

1. Did the Casey DRRA freeze a broader scope of local laws than permitted legally, thereby rendering the BOCC's approval and the County's execution unlawful in whole or in part?

2. Did the BOCC fail to make certain factual findings required to rezone lawfully the Casey property for the PUD zone?

**Standard of Review**

When reviewing the piecemeal zoning decision of a local zoning body, "[o]ur role is 'limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is

---

[5] We shall condense and paraphrase CLI's questions for clarity and brevity. In full, CLI presented originally six questions, one of which was withdrawn before the case was heard by this Court:

    A. Is the freeze provision of the DRRA overly broad given the sworn testimony of the County's Expert Planning Director establishing that most of the County laws referenced in the DRRA's "freeze" provision do not "govern" use, density[,] or intensity?

    B. Is the scope of the freeze provision now ripe for judicial review given Frederick County's recent amendments to its waterbody law, its MPDU law, and its building, electrical, and plumbing laws, all of which explicitly or implicitly fall within the DRRA's definition of "development laws" and thereby fall within the "freeze"?

    C. Does a statutory analysis of the DRRA law confirm that the freeze is limited to laws governing use, density[,] or intensity?

    D. Is the BOCC's rezoning action ultra vires and void because the 2012 Land Use Map provides no legal basis for the PUD floating zone application? [Appellants filed a "Notice of Appellants' Withdrawal of Question D" on 11 July 2016.]

    E. Is Rezoning Ordinance No. 13-14-642 unsustainable because it lacks any finding that the proposed development design and building site are in accordance with the County Comprehensive Plan under Zoning Ordinance Section 10-19-10.500.3(B)? [CLI intended presumably to refer to Ordinance No. 14-20-675 because Ordinance No. 13-14-642 pertains to an irrelevant property.]

    F. Should the rezoning action be reversed because it is not consistent with the County's Comprehensive Plan?

5

premised upon an erroneous conclusion of law.'" *Grasslands Plantation, Inc. v. Frizz-King Enterprises, LLC*, 410 Md. 191, 203, 978 A.2d 622, 629 (2009) (quoting *United Parcel Serv. v. People's Counsel for Baltimore Cnty.*, 336 Md. 569, 577, 650 A.2d 226, 230 (1994)).

"The scope of judicial review of administrative fact-finding is a narrow and highly deferential one." *Trinity Assembly of God of Baltimore City, Inc. v. People's Counsel for Baltimore Cnty.*, 407 Md. 53, 78, 962 A.2d 404, 418 (2008). We do not substitute our judgment for that of the BOCC, but rather, determine whether "'a reasonable mind might accept as adequate' the evidence supporting it." *Id.* (quoting *People's Counsel for Baltimore Cnty. v. Loyola College in Md.*, 406 Md. 54, 67, 956 A.2d 166, 174 (2008)). "'Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts.'" *Grasslands Plantation, Inc.*, 410 Md. at 204, 978 A.2d at 629 (quoting *Bd. of Physician Quality Assurance v. Banks,* 354 Md. 59, 69, 729 A.2d 376, 381 (1999)).

We shall recount at the appropriate point in this opinion the principles governing judicial consideration of statutory interpretation questions.

**Discussion**

CLI mounts several arguments with respect to the DRRA: the statutory interpretation of the DRRA legislation, as applied to the relevant provision in the Agreement in this case, is ripe for appellate review because Frederick County amended

several implicated laws since the execution of the DRRA in this case; the freeze provision of the Casey DRRA expands unlawfully the breadth of laws that may be frozen; and, Maryland's DRRA enabling statute does not authorize parties to a DRRA to expand by negotiation the legally permissible scope of laws to be frozen. Regarding the BOCC's rezoning of the Casey property, CLI argues that the BOCC failed to make requisite factual findings regarding design and building siting, compatibility with neighboring land use and plans, and population growth. Appellee Casey answers, regarding the DRRA, that: State and Frederick County laws permit DRRAs to freeze the range of local laws provided in the Casey DRRA; parties to a DRRA may negotiate which local laws governing "use, density, or intensity" will be frozen; and, execution of the DRRA, in light of recent amendments to implicated County laws, does not operate to usurp County police powers as reflected in the amended laws. On the rezoning question, Casey contends that the BOCC made all of the factual findings necessary to rezone the Casey property.

## I. The BOCC approved, and the County executed, the Casey DRRA based on substantial evidence and without legal error.

### A. The statutory interpretation question regarding the DRRA's freeze provision is ripe for judicial review.

CLI contends that its statutory interpretation contention *vis-à-vis* the scope of the "freeze" provision of the DRRA is ripe for judicial review because the County amended

7

the substantive requirements, since the execution of the DRRA, of several local laws implicated by the freeze provision in this case.[6]

> A controversy is ripe when there are interested parties asserting adverse claims *upon a state of facts which must have accrued* wherein a legal decision is sought or demanded. The declaratory judgment process is not available to decide purely theoretical questions or questions that may never arise, or questions which have become moot, or merely abstract questions. Nor should it be employed where a declaration would not serve a useful purpose or terminate a controversy. To address issues which are non-justiciable because they are not ripe would place courts in the position of rendering purely advisory opinions, a long forbidden practice in this State.

*Hickory Point P'ship v. Anne Arundel Cnty.*, 316 Md. 118, 129–30 (1989) (quotation marks and citations omitted).

As discussed in greater depth *infra*, the Casey-County DRRA purported to freeze a variety of specific Frederick County local ordinances or fields of regulation, i.e., laws, rules, regulations, and policies related to "development, subdivision, zoning, comprehensive planning, moderately priced dwelling units, growth management, impact fees, water, sewer, stormwater management, environmental protection, land planning and design, adequate public facilities laws[,] and architecture." Casey DRRA, Art. VIII § 8.1.B. Because, since the Casey DRRA's execution, the County amended, among other

---

[6] CLI advances pre-emptively this argument because, in a 2015 unreported opinion involving a similar appellant and the County as one of the appellees, this Court declined to consider fully, as unripe, the scope of laws frozen by an unrelated DRRA because, at the time of judicial review, no implicated local laws changed since the contested DRRA's execution.

laws, its ordinance regulating developments near waterbodies, CLI argues that its challenge

to the scope of the freeze provision is ripe for judicial review:[7]

> Frederick County has amended a number of County laws that are directly implicated by the DRRA's freeze provision, including an amendment to the County's Waterbody law limiting imper[v]ious development within the waterbody buffers. . . . [T]he Waterbody amendments would be directly applicable to the impervious structures allowed on the Casey property, which is heavily traversed by waterbodies. Several tributaries to Linganore Creek and Lake Linganore originate or flow through the Casey Property. Lake Linganore provides drinking water to Frederick County and Frederick City Residents.

FCC § 1-19-9.400, amended in 2015, mandates waterbody buffer requirements for

"[a] parcel, lot, or tract of land submitted to Frederick County for subdivision or

resubdivision review and approval," and applies "to applications for subdivision or

resubdivision approved after November 10, 2013." The ordinance regulates generally the

development activities that may transpire permissibly in proximity to a waterbody, and the

amended portion, § 1-19-9.400(D), governs specifically the construction of "buildings,

---

[7] CLI points also to amendments in the County's electrical, building, and plumbing codes that became effective after the execution of the Casey DRRA. It is debatable whether these ordinances were frozen under § 8.1.B of the Agreement or that they govern use, density, or intensity, as that phrase is understood according to our statutory analysis *infra*. Because amendment of the local ordinance regulating developments near waterbodies implicated clearly several of the regulatory fields embraced by § 8.1.B of the DRRA (e.g., water, environmental protection, and land planning and design), we need go no further in overcoming the ripeness threshold.

We note in passing that, even if post-Agreement amendments to the building, electrical, and plumbing codes were considered in the analysis of whether the ripeness requirements are satisfied here, these sorts of highly technical codes are amended frequently to conform to evolving national, State, or industry standards, some of which amendments are relatively mundane and others may reflect significant public safety considerations (e.g., requiring sprinklers in dwellings). It is problematic whether the more mundane changes in such codes, which may fall outside the intended scope of the "freeze" provision in the DRRA enabling statute and/or the Casey Agreement in any event, would satisfy the common law ripeness standards.

9

structures, or impervious surfaces" and other "activities requiring clearing or grading over 5,000 square feet" in waterbody buffers. Home to "stream corridors" and "stream valleys designated as Natural Resources," Ordinance No. 14-20-675 at 4, 6, the Casey property contains "[s]everal tributaries to Linganore Creek / Lake Linganore [that] originate or flow through the *Casey Foundation* . . . propert[y]." ENVIRENS INC., ASSESSMENT OF POTENTIAL OCCURRENCE – RARE, THREATENED AND ENDANGERED SPECIES 4 (Aug. 20, 2014). The presence of streams and tributaries on the property catalyzes the need for Casey to consider and meet the requirements of FCC § 1-19-9.400 as amended, unless the DRRA in this case "freezes" this area of regulation as of the effective date of the DRRA.

We agree with CLI that its challenge to the scope of the freeze provision of the Casey DRRA is ripe for review. The amendment of the aforementioned local provision constitutes an accrued state of facts, beyond the theoretical, that bears directly on the justiciable question of whether the DRRA froze properly a wide range of laws, implicating, at a minimum, the ordinance regulating developments near waterbodies that was amended subsequent to the execution of the DRRA and would otherwise apply to development of the Casey property.

### B. The DRRA Act's legislative history and purpose suggest an intent to freeze a broader range of local laws than merely the local zoning ordinance.

Each side posits facially reasonable arguments regarding interpretation of the scope of "local laws, rules, regulations, and policies governing the use, density, or intensity of the real property subject to [a DRRA]." LU § 7-304. Appellants read "use," "density," and "intensity" as zoning terms of art (not science) and advocate a narrow interpretation

10

that limits a DRRA's freeze provision to the local zoning ordinance. Appellees Casey and the County urge, on the other hand, a broader reading that encompasses the several regulatory domains listed in its DRRA: "[c]ontrary to Appellants' assertions, the laws, rules, regulations, and policies 'frozen' in § 8.1.B of the Casey DRRA do affect the use, density[,] or intensity of the project. For example, subdivision regulations necessarily affect the density of a development because platting and other requirements determine the number of lots that can be created on any given parcel. The same is true for stormwater regulations, since these requirements can affect where the development is ultimately located."

LU § 7-304 reads as follows:

(a) Except as provided in subsection (b) of this section, the local laws, rules, regulations, and policies governing the use, density, or intensity of the real property subject to an agreement shall be the local laws, rules, regulations, and policies in force at the time the parties execute the agreement.

(b) If the local jurisdiction determines that compliance with local laws, rules, regulations, and policies enacted or adopted after the effective date of an agreement is essential to ensure the public health, safety, or welfare, an agreement may not prevent a local government from requiring a person to comply with those local laws, rules, regulations, and policies.

Article VIII § 8.1 of the Casey-County DRRA identifies the local laws, rules, regulations, and policies subject to its freeze provision as follows:

8.1 *Effect of Agreement*

B. Except as otherwise provided in Sections 2.5, 3.4[,] and 8.3 of this Agreement, the County Development Laws, regulations[,] and policies governing the use, density[,] or intensity of the Property, **including but not limited to those governing development, subdivision, zoning, comprehensive planning, moderately priced dwelling units, growth management, impact fees, water, sewer, stormwater management, environmental protection, land planning and**

11

**design, adequate public facilities laws[,] and architecture** shall be the laws, rules, regulations[,] and policies, if any, in force on the Effective Date of the Agreement.

C. If the BOCC determines that compliance with County Development Laws enacted or adopted after the Effective Date of this Agreement is essential to ensure the health, safety[,] or welfare of residents of all or part of Frederick County, the BOCC may impose the change in laws, rules, regulations[,] and policies and the effect thereof upon the Property.

(emphasis added).

Courts are guided by a number of principles when confronting cases calling upon them to discern the intended meaning of contested statutory text:

We look first to the language of [the statute]. We apply the well settled rules of statutory construction in interpreting the statute before us. The cardinal rule of statutory construction is to ascertain and effectuate the intent of the Legislature. In ascertaining legislative intent, we first examine the plain language of the statute, and if the plain language of the statute is unambiguous and consistent with the statute's apparent purpose, we give effect to the statute as it is written. If the language of the statute is ambiguous, we resolve the ambiguity in light of the legislative intent, considering the legislative history, case law, and statutory purpose. We consider both the ordinary meaning of the language of the statute and how that language relates to the overall meaning, setting, and purpose of the act. We avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense. We construe a statute as a whole so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory.

*Jamison v. State*, __ Md. __, __ A.3d __, No. 6, Sept. Term 2016, 2016 WL 6755922, at *4 n.9 (Md. Nov. 15, 2016) (quoting *Blake v. State*, 395 Md. 213, 224, 909 A.2d 1020, 1026 (2006)) (citations omitted).

We conclude to be ambiguous on its face the intended scope of "the local laws, rules, regulations, and policies" that "govern[] the use, density, or intensity" of real

property.[8]  "Govern," according to Black's Law Dictionary, means "to control a point in issue."  *Black's Law Dictionary* 810 (10th ed. 2014).  Zoning laws control unmistakably the use, density, or intensity of real property, but laws regulating, for example, subdivision, architecture, public utility requirements, and environmental protection may do so as well. Somewhat more attenuated in their potential for "control" of "use, density, or intensity" are impact fees and stormwater management requirements.  We turn, therefore, to the legislative history and purpose of the DRRA Act to seek aid in pursuit of identifying the Legislature's intent.[9]

### 1. The DRRA Act's legislative history indicates that the Maryland General Assembly contemplated that DRRAs may freeze a broader range of local laws than just zoning ordinances.

Our review of the DRRA Act's legislative history unearthed two significant documents.  First, the Fiscal Note for HB 700, the original bill that became the Act in 1995,

---

[8] Although the opposing reasonable interpretations advanced by the parties here would be sufficient alone for us to conclude the statute to be ambiguous on its face, we shall delve further into why we are persuaded to that end.  *Montgomery Cnty. v. Phillips*, 445 Md. 55, 62, 124 A.3d 188, 192 (2015) (quoting *Stoddard v. State*, 395 Md. 653, 662, 911 A.2d 1245, 1250 (2006)) ("'We have said that there is an ambiguity within [a] statute when there exists two or more reasonable alternative interpretations of the statute. When a statute can be interpreted in more than one way, the job of this Court is to resolve that ambiguity in light of the legislative intent, using all the resources and tools of statutory construction at our disposal.'").

[9] The "'recognized indicia'" of legislative intent include "'the general purpose behind the statute'" as well as "'the legislative history, including the derivation of the statute, comments and explanations regarding it by authoritative sources during the legislative process, and amendments proposed or added to it.'"  *Wagner v. State*, 445 Md. 404, 418, 128 A.3d 1, 10 (2015), *reconsideration denied* (Jan. 22, 2016) (quoting *Stoddard v. State*, 395 Md. 653, 662, 911 A.2d 1245, 1250 (2006)).  The legislative documents discussed *infra* constitute authoritative "comments and explanations."

13

discussed some of the types of local laws implicated by the DRRA in dispute here. With specific reference to local revenues, the Fiscal Note stated that "[a] local jurisdiction opting to enact such an [implementing] ordinance and enter into agreements could be affected to the extent that **during the period of an agreement it could not effect changes in impact fees, permit fees, water and sewer hookup fees, etc**. applicable to development. Thus, there could be a loss in revenues, of an indeterminate amount, to the local governments." MD. GEN. ASSEMB. DEP'T OF FISCAL SERVS., FISCAL NOTE, H.B. 700, at 1 (1995) (emphasis added). Moreover, regarding local expenditures, "[t]he Department of Fiscal Services points out that increases in the costs of **paving, storm drains, water and sewer hookups, etc.** would have to be absorbed by the local jurisdiction unless an agreement accounts for cost increases otherwise (depending on applicable development policies)." FISCAL NOTE at 2 (emphasis added). Similarly, the Senate Economic and Environmental Affairs Committee Floor Report for HB 700 stated, in reference to the bill's local fiscal impact, "[r]evenues may decrease by an indeterminate amount due to the inability of a local jurisdiction to make changes to **development fees, for example, impact fees, permit fees, water and sewer hookup fees**, during the period of an agreement." S. ECON. AND ENVTL. AFFAIRS COMM., FLOOR REPORT, H.B. 700, at 2 (Md. 1995) (emphasis added).

These statements demonstrate that the General Assembly was aware of, and contemplated presumably, the DRRA Act's freeze provision to embrace more than merely zoning ordinances, including something as seemingly attenuated as a variety of fees related to development. The use of "etc." in both passages from the Fiscal Note, and "for example" in the Floor Report, suggest that the General Assembly anticipated that the freeze provision

14

would impact fiscally local jurisdictions via the suspended application of increases in existing fees or the creation of new kinds of fees, and even more kinds of laws than fee schemes.

It is patent that local zoning ordinances govern most directly the "use, intensity, or density" of real property. Subdivision ordinances and regulations, as well as many environmental and public facility or utilities laws (enforced typically during the subdivision process) are to like effect. Costs and fees associated with public facilities impacts, permits, and water and sewer hookups, on the other hand, seem at first glance rather more attenuated from direct governance of a property's "use, intensity, or density." And yet, the DRRA Act's legislative history demonstrates the Legislature's contemplated inclusion of them as well as among reachable local laws for purposes of LU § 7-304(a). Viewing relevant local provisions on a continuum from the most direct governance to the least contemplated by the freeze provision, zoning and subdivision would be located at one end and fees at the other. Assuming these outer limits for purposes of the DRRA in the present case, the freeze provision must contemplate, axiomatically, local laws, rules, regulations, and policies that might fit between these poles. Local provisions related to development, comprehensive planning, moderately-priced dwelling units, growth management, environmental protection, land planning and design, adequate public facilities laws, and architecture govern more clearly "use, intensity, or density" than do, for example, impact and permit fees. We conclude, therefore, that the Maryland General Assembly intended the DRRA Act's freeze provision to contemplate each of the genres of local laws listed in Article VIII § 8.1.B of the Casey-County DRRA.

15

## 2. Restricting the DRRA Act's freeze provision to only zoning laws would undermine its statutory purpose.

However fictional the notion of institutional intent may sometimes be, it is fair to say that legislation usually has some objective, goal, or purpose. It seeks to remedy some evil, to advance some interest, to attain some end. If we characterize the search for legislative intent as an effort to seek to discern some general purpose, aim, or policy reflected in the statute, we state the concept more accurately and avoid the fiction.

*Kaczorowski v. Mayor & City Council of Baltimore*, 309 Md. 505, 513, 525 A.2d 628, 632 (1987) (quotation marks and citation omitted).

In its 1995 analysis of H.B. 700, the House Commerce and Government Committee explained that State DRRA laws seek to "solve the vesting problem" by "(1) prohibiting local governments from applying new regulations to on-going projects by defining when vesting occurs, and (2) authorizing the use of development agreements." H. COMMERCE AND GOV'T COMM., BILL ANALYSIS, H.B. 700, at 3 (Md. 1995).[10] The "vesting problem" refers to the balancing of a developer's interest in securing and consolidating its legal footing to begin and complete a development project with a local jurisdiction's interest in governing the pertinent legal domains, including amending laws and policies as necessary. In 1993, the Court of Appeals held that a developer's rights in the development of a property vest only upon a level of visible commencement of lawful construction. *Prince George's Cnty., Md. v. Sunrise Dev. Ltd. P'ship*, 330 Md. 297, 623 A.2d 1296 (1993). This opinion recognized that local governments may "change a permissible land use . . . very late in the land use approval process. In fact, a change could occur after the issuance of a

---

[10] The cited content of this BILL ANALYSIS is mirrored in a rearranged format in S. ECON. AND ENVTL. AFFAIRS COMM., BILL ANALYSIS, H.B. 700, at 2-3 (Md. 1995).

building permit." BILL ANALYSIS at 3. The purpose of the DRRA Act, therefore, was to strike a balance between the interests of developers and local governments to "solve the vesting problem."

The House Commerce and Government Committee explained such a balance as follows:

> Development agreements can provide benefits for both developers and local governments. For the developer, a development agreement establishes the rules and regulations which will govern the project throughout its construction, and perhaps beyond. For the local government, the development agreement provides for greater certainty in the comprehensive planning process, as well as an opportunity to ensure the provision of necessary public facilities.

BILL ANALYSIS at 3.

What would achieve best the legislative purpose of balancing a developer's interest in legal stability against a local government's interest in certainty and obtaining enhanced public benefits: limiting, for example, the Casey DRRA's freeze provision to subsequent changes in the zoning code only, as urged by CLI, or allowing it to apply to the expansive list of local provisions in the negotiated DRRA as written? If the DRRA Act only allowed DRRAs to freeze the application of local zoning ordinance provisions, a local government could undermine still the legal and financial stability of an on-going development project by changing the laws related to, for example, development or site plans, subdivision, or planning compliance. Where a developer assumed that its project could be thwarted by a last-minute or mid-stream change to any of these non-zoning laws, it would be less likely to undertake a substantial development at all in a jurisdiction. This, in turn, would frustrate

the local government's interest in obtaining greater public benefits through negotiation of a DRRA's terms.

We conclude that, like its statutory history, the purpose of the DRRA Act suggests a more expansive reading of the local laws eligible for inclusion in a DRRA's freeze provision, beyond merely the local zoning ordinance, that includes the local laws and regulations falling into the categories listed in the Casey-County DRRA. Accordingly, the BOCC's approval (and the County's execution) of the DRRA, including its expansive and specific freeze enumeration in Article VIII § 8.1.B, does not expand impermissibly the statutorily-allowed scope of local laws, rules, regulations, and policies governing use, density, or intensity beyond that contemplated by LU § 7-304(a).[11]

### C. The parties to the Casey DRRA did not negotiate impermissibly the freeze provision, nor does the DRRA interfere with local police powers.

---

[11] We do not decide here whether local legislative fields of regulation, other than those listed specifically in Art. VIII, § 8.1.B of the Casey Agreement, might fall within or without the intent of the Legislature in describing in LU § 7-304(a) "local laws, rules, regulations, and policies governing . . . use, density, or intensity." Nor do we decide whether any specific local law, rule, regulation, or policy not discussed in this opinion fits into any specific category in the Agreement. Moreover, we do not consider the scope (if any) of the catch-all description in § 8.1.B of the Casey DRRA, "including but not limited to," that precedes the enumeration of the regulatory fields intended to be frozen by the Agreement.

Although they forebode further litigation, there will be further opportunities to test the ultimate boundaries of any freeze provision in a DRRA. Casey (or its successors/assigns), for example, will confront many additional and necessary governmental development processes, at which times the appropriate governmental body may confront questions regarding whether a law, regulation, or policy is frozen or not. Even if the specific regulatory rule then under examination is deemed covered by the Agreement (and comes within the intent of LU § 7-304(a)), the local government may unfreeze the rule by exercising its prerogative under Art. VIII, § 8.1.C of the Agreement, for public safety, health, and welfare reasons, as noted *infra* at 19.

18

Because we find permissible the BOCC's and the County's interpretation and application of the DRRA Act's freeze provision as reflected in the Casey-County DRRA, we reject also CLI's argument that the parties to the agreement attempted to negotiate the freeze of local laws beyond those governing "use, density, or intensity." Certainly the Casey-County DRRA freezes a panoply of laws beyond zoning, but the DRRA Act's legislative history and purpose support a broader interpretation of what provisions govern use, density, or intensity beyond zoning alone. We reject further CLI's contention that the Casey-County DRRA's expansive manifestation of the freeze provision interferes with the proper exercise of local police powers. Regardless of the scope of laws a given DRRA freezes, LU § 7-304(b) allows a local government to enforce any "local laws, rules, regulations, and policies enacted or adopted after the effective date of an agreement" if compliance with the new laws "is essential to ensure the public health, safety, or welfare." Article VIII § 8.1.C of the Casey DRRA provides exactly for that potentiality.[12]

## II.    The BOCC's rezoning decision is supported by substantial evidence.

Appellants argue that the BOCC rezoned the Casey property without making the factual findings required by the Frederick County Code and State law regarding design and building siting, compatibility with neighboring land uses, and population growth.

### A. Zoning Ordinance No. 14-20-675 satisfies FCC § 1-19-10.500.3(B)'s requirement of a finding that design and building siting accord with the Comprehensive Plan.

---

[12] Given our conclusion as to the General Assembly's intent in enacting Art. 66B, § 13.01 and LU § 7-304(a), no purpose is served by considering CLI's arguments regarding how other States and localities have enacted or interpreted their DRRA legislation.

In Zoning Ordinance No. 14-20-675, the BOCC set-out its factual findings with respect to the requirements of the FCC. FCC § 1-19-10.500.3(B) requires a finding that "[t]he proposed development design and building siting are in accordance with the County Comprehensive Plan, and any applicable community and corridor plans[.]" CLI argues that the BOCC made no findings relative to this provision, and that, in any event, such factual findings could not possibly be made because "the 2010 Comprehensive Plan Map did not contemplate that the Casey Property would be eligible for PUD zoning." Casey counters that the BOCC made indeed the requisite factual findings regarding the compatibility of its property's design and building siting with the Comprehensive Plan, albeit scattered throughout the Zoning Ordinance.

It must be conceded that the BOCC listed no factual findings pursuant to FCC § 1-19-10.500.3(B) on the page of the Rezoning Ordinance where such a heading appears. Ordinance No. 14-20-675 at 17. According to Casey, however, a more nuanced reading of the entire Rezoning Ordinance is required because of the overlap of findings required by State and County law. The BOCC, according to Casey, structured intentionally the Ordinance to address FCC § 1-19-10.500.3(B) in a piecemeal fashion scattered throughout the document under other headings. Casey notes that the Court of Appeals condoned such an approach. *Critical Area Comm'n for Chesapeake & Atl. Coastal Bays v. Moreland, LLC*, 418 Md. 111, 134, 12 A.3d 1223, 1237 (2011) ("We can discern no statutory or jurisprudential basis for the conclusion that summarizing the evidence in a separate section deprived the Board's conclusory findings of adequate evidentiary support. Semantically,

20

on this record, to find the organizational structure of the Board's written decision defective or incomprehensible would be to elevate form over substance.").

With respect to design and the siting of buildings, the BOCC described the development as follows:

> The overall plan for the development delineates six distinct residential land bays, a school site, and a commercial site. These areas are located on land with minimal environmental and physical obstructions. The lands outside of these areas include stream corridors, forested land, steep slopes, and floodplains. The concept for development of this property is to allow the existing environmental features of the property to establish the overall layout.
> A proposed arterial road runs continuously through the Site from south to north, connecting the various land bays. Frontage along this central spine road alternates between development bays and natural open space areas, creating a system of access that intertwines the natural environment and the built environment. A hiking and biking trail along the spine road provides an additional access network between the open space and the development bays and enhances interconnection between them by branching into the open space areas.

Ordinance No. 14-20-675 at 4.

In a subsequent section of the Ordinance entitled "Consistency with the Comprehensive Plan," the BOCC stated that, because of the Casey property's LDR designation and location in the Linganore CGA, "it is identified as an area that has been targeted for growth and development and is therefore consistent with the general policy in the Comprehensive Plan that supports the location of growth within growth areas." Ordinance No. 14-20-675 at 6. The BOCC found also that rezoning the Casey property to PUD "is consistent with the current County Comprehensive Plan," and that the proposed development accords with the Plan's "overall community development principles such as encouraging higher density development, a mix of land uses, providing distinctive design that contributes to a distinctive community character, efficiency of layout relative to public

21

infrastructure, and general accessibility through multiple modes of transport as well as interconnectedness of the transportation network." Ordinance No. 14-20-675 at 6-7.

It appears to us that the BOCC made adequate findings supporting a favorable conclusion relative to the factors in FCC § 1-19-10.500.3(B).

**B. Zoning Ordinance No. 14-20-675 satisfies FCC § 1-19-10.500.3(C)'s requirement of a finding that the proposed development is compatible with surrounding land uses.**

FCC § 1-19-10.500.3(C) requires factual findings that:

The proposed development is compatible with existing or anticipated surrounding land uses with regard to size, building scale, intensity, setbacks, and landscaping, or the proposal provides for mitigation of differences in appearance or scale through such means as setbacks, screening, and landscaping; or other design features in accordance with the County Comprehensive Plan, and any applicable community or corridor plans[.]

CLI argues that "[w]hile the BOCC makes compatibility findings in connection with land uses that abut the outer perimeter of the Casey Property, it entirely omits any findings in connection with Hall[']s Choice Farm." As with the BOCC's design and siting findings discussed *supra*, here, the BOCC appears to have addressed appropriately Hall's Choice Farm elsewhere in the Ordinance. First, the BOCC described the property: "[t]he Site surrounds an existing horse farm, Hall's Choice Farm, which is a 35 acre sales, breeding, and training facility for Hanoverian horses. This property is not a part of this PUD application, though it is designated Low Density Residential and is part of the growth area." Ordinance No. 14-20-675 at 14. Further along in the Ordinance, the BOCC examined the Casey developments' compatibility with the use of the farm: "[l]andscape buffers between the project and Hall[']s Choice Farm, the Audubon Property, and the Swanby Property will

22

effectively mitigate potential inconsistencies between the project and the existing uses on those properties." Ordinance No. 14-20-675 at 23.

### C. Zoning Ordinance No. 14-20-675 includes the requisite finding regarding population growth.

CLI maintains that, even if rezoning the Casey property accords with the Comprehensive Plan, the BOCC failed to engage in new population growth studies, necessitated by the fact that the Plan's "policies, visions[,] and goals (not to mention the land use and zoning maps) were predicated upon" now-outdated population projections. In the Rezoning Ordinance, however, the BOCC calculated the population increase expected to result from developing the Casey property, based on 2010 U.S. Census data, finding that "[t]he potential additional population change as a result of the proposed 1,017 units equates to 2,746 persons, based on 2.7 persons per household." Ordinance No. 14-20-675 at 15. Speculating that, "[a]s a matter of public policy," LU § 4-204(b)(1)(i)'s requirement that a population finding accompany a zoning-changing map amendment must entail more than "a mere mathematical equation devoid of any planning or growth analysis," CLI asserts that the BOCC "fail[ed] to make a meaningful finding in connection with 'population.'"

As to the BOCC's approach to addressing the findings regarding design and the siting of buildings, compatibility with neighboring land uses, and population growth, we must defer to the expertise of the BOCC. "The scope of judicial review of administrative fact-finding is a narrow and highly deferential one," and we do not substitute our judgment for that of the BOCC. *Trinity Assembly of God of Baltimore City, Inc. v. People's Counsel*

23

*for Baltimore Cnty.*, 407 Md. 53, 78, 962 A.2d 404, 418 (2008).  Accordingly, for all three instances of allegedly missing or defective findings, we hold that the BOCC had before it substantial evidence upon which it based its findings and ultimate rezoning decision.

> **JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**