Lillian C. Blentlinger, LLC William L. Blentlinger, LLC v. Cleanwater Linganore, Inc. et al., No. 13, September Term, 2017

**DEVELOPMENT RIGHTS AND RESPONSIBILITIES AGREEMENT – REQUIRED CONTENTS – "ENHANCED PUBLIC BENEFITS" – MD. CODE ANN., LAND USE (2012) § 7-303 – CONSIDERATION –** Court of Appeals held that, based on plain language and legislative history of Md. Code Ann., Land Use (2012, 2014 Repl. Vol.) §§ 7-301 to 7-306 ("DRRA statute"), as well as relevant case law, to be valid Development Rights and Responsibilities Agreement ("DRRA") is not required to confer enhanced public benefit to local governing body, *i.e.*, county. Stated otherwise, Court held that there is no evidence in DRRA statute, its legislative history, or case law demonstrating intent to require enhanced public benefit as part of DRRA, and accordingly, Court held that DRRA at issue in case was not required to confer any enhanced public benefit to county, and was supported by sufficient consideration.

Circuit Court for Frederick County
Case No. 10-C-14-003828 AA

Argued: October 10, 2017

IN THE COURT OF APPEALS

OF MARYLAND

No. 13

September Term, 2017

_____

LILLIAN C. BLENTLINGER, LLC
WILLIAM L. BLENTLINGER, LLC

v.

CLEANWATER LINGANORE, INC. et al.

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Opinion by Watts, J.

_____

Filed: November 17, 2017

This case involves a Development Rights and Responsibilities Agreement ("DRRA"), which is governed by Md. Code Ann., Land Use (2012) ("LU") §§ 7-301 to 7-306 ("the DRRA statute"), and is defined as "an agreement between a local governing body and a person having a legal or equitable interest in real property to establish conditions under which development may proceed for a specified time." LU § 7-301(b). A "local governing body," in turn, "means the legislative body, the local executive, or other elected governmental body that has zoning powers under this division." LU § 7-301(c). The purpose of a DRRA is to allow developers and local governing bodies, such as a county, to negotiate terms and conditions under which development may occur. A DRRA serves to streamline the various approval processes that must occur for a complex development project. To that end, one of the key aspects of a DRRA is controlled by the "freeze provision" of the DRRA statute, LU § 7-304(a), which permits parties to agree to freeze certain laws, rules, regulations, and policies as of the time of the execution of the DRRA. LU § 7-304(a) provides: "Except as provided in subsection (b) of this section, the local laws, rules, regulations, and policies governing the use, density, or intensity of the real property subject to an agreement shall be the local laws, rules, regulations, and policies in force at the time the parties execute the agreement."[1] The effect of the freeze provision is

---

[1]LU § 7-304(b) provides:

> If the local jurisdiction determines that compliance with local laws, rules, regulations, and policies enacted or adopted after the effective date of an agreement is essential to ensure the public health, safety, or welfare, an agreement may not prevent a local government from requiring a person to comply with those local laws, rules, regulations, and policies.

that developers are able to move forward, with certainty regarding the applicable laws, with development projects that may extend over a long period of time.

Importantly, pursuant to LU § 7-303(a), to be valid a DRRA must contain certain requirements. And, like any other contract, a DRRA must be supported by consideration. In this case, we decide whether a DRRA must be supported by "enhanced public benefits" to be valid—*i.e.*, whether a DRRA must confer an enhanced public benefit to the county, and whether the DRRA at issue is supported by adequate consideration.[2] We hold that, based on the plain language and legislative history of the DRRA statute, as well as relevant case law, to be valid a DRRA is not required to confer an enhanced public benefit[3] on a county. In other words, there is no evidence in the DRRA statute, its legislative history, or case law demonstrating an intent to require an enhanced public benefit as part of a DRRA. And, we hold that the DRRA at issue in this case is not required to confer any enhanced public benefit to the county, and is supported by sufficient consideration. Accordingly, we reverse the judgment of the Court of Special Appeals.

---

[2]Although "[i]t is basic contract law that courts generally will not inquire as to the adequacy of consideration[,]"Vogelhut v. Kandel, 308 Md. 183, 190-91, 517 A.2d 1092, 1096 (1986)—*i.e.*, that a court generally does not analyze whether there is adequate consideration supporting a contract—the specific argument raised by the parties in this Court is whether there is adequate consideration supporting the DRRA at issue given the alleged lack of enhanced public benefits. As such, we address the sufficiency of the consideration.

[3]The term "enhanced public benefit" does not appear in the DRRA statute. It is a term mentioned for the first time in case law of this Court. See Queen Anne's Conservation, Inc. v. Cty. Comm'rs of Queen Anne's Cty., 382 Md. 306, 322, 855 A.2d 325, 334 (2004).

**BACKGROUND**

This case arose under the following circumstances. Lillian C. Blentlinger, LLC and William L. Blentlinger, LLC, Petitioners, own two parcels of land ("the Property") in Frederick County, Maryland ("the County"), Respondent, totaling approximately 279 acres. The Blentlinger family farmed the Property for generations before deciding to explore the possibility of developing the Property for other uses. Since 1959, the Property had been zoned for agricultural use. In 2006, for the first time, the Property was designated for Low Density Residential ("LDR") land use as part of the 2006 New Market Region Plan. Being designated for LDR land use permits a property owner to apply for a Planned Unit Development ("PUD"). Frederick County Code (2014) ("FCC") § 1-19-10.500.2(A) provides, in pertinent part, that a "PUD District may only be established where the tract of land receiving the PUD District has a County Comprehensive Plan Land Use designation of [LDR], Medium Density Residential, or High Density Residential[.]" A PUD is a "floating zone[] established to provide for new development and redevelopment within identified growth areas that result in an integrated mixture of commercial, employment, residential, recreational, civic and/or cultural land uses as provided within the appropriate Frederick County Comprehensive, Community, or Corridor Plan." FCC § 1-19-10.500.1.

Sometime in 2007, however, the Frederick County Board of County Commissioners ("the BOCC")[4] removed the Property's designation for LDR land use. During the 2008

---

[4]On December 1, 2014, Frederick County became a charter county, and the BOCC was replaced with a County Executive and a County Council. See Frederick County Charter §§ 802, 805.

update of the New Market Region Plan, the Property's designation was changed to agricultural/rural. During the 2010 Comprehensive Plan update, the Property's designation remained agricultural/rural. With the 2012 Comprehensive Plan, the Property's designation was changed back to LDR, and the Property was included in the Linganore Community Growth Area. Since 2012, the Property has been designated for LDR land use.

On February 25, 2014, after the Property had been re-designated for LDR land use, Petitioners filed an application to rezone the Property from agricultural to PUD zoning as well as a Phase I Concept Plan. Petitioners proposed developing the Property to have 720 residential dwelling units, including a mix of single-family homes and townhomes, and included an approximately twenty-five-acre site for a future middle school. On March 11, 2014, Petitioners filed an application or petition for a DRRA, and included a draft DRRA to be entered into between Petitioners and the BOCC. The DRRA petition incorporated by reference the PUD application and the Phase I Concept Plan. In a letter dated May 5, 2014, Jim Gugel ("Gugel"), the Planning Director for the Frederick County Planning and Development Review Department, advised Petitioners that, on April 15, 2014, the BOCC "accepted" the DRRA petition.

On July 30, 2014, at a public hearing, the Frederick County Planning Commission ("the Planning Commission") unanimously voted (five to zero, with two members absent) to recommend the approval of the application to rezone the Property from agricultural to PUD. On October 8, 2014, Planning Commission staff recommended that the "Planning Commission find that the location, character, and extent of the proposed [DRRA] for the [] Property are consistent with the County Comprehensive Plan." Also on October 8, 2014,

at a public hearing, the Planning Commission reviewed the draft DRRA, and, in accordance with its staff's recommendation, voted to find the draft DRRA consistent with the Frederick County Comprehensive Plan. On October 22, 2014, Gugel and an Assistant County Attorney issued a staff report recommending that the BOCC review the proposed DRRA "and any conditions related thereto in deciding whether to approve or deny the [] DRRA."

On November 6, 2014, the BOCC conducted a public hearing on the PUD application and the DRRA, and witnesses testified and were subject to cross-examination. At the hearing, members of the public and counsel for Cleanwater Linganore, Inc., RALE Inc., Nikki Chauvin, Jimmy D. Duffy, Joyce A. Duffy, Paul D. Garcia, Tracy E. Garcia, Dang Mindte, Carrie Payne, Pamela Pennington, Carol Swandby, Reggie Wade, and Patricia Wells (collectively, "Cleanwater"), Respondents, cross-examined witnesses and provided public comment. During the hearing, the BOCC voted four-to-one to approve the PUD rezoning application, but limited the total unit count to 675 residential dwelling units, including 500 single-family homes and 175 townhomes,[5] on the condition that no building permit for the construction of a residence could be obtained before January 1, 2020.

As to the DRRA, during the hearing, Cleanwater's counsel questioned Petitioners' counsel about any "greater public benefits" that the DRRA offered, and the following exchange occurred:

---

[5]Pursuant to FCC § 1-19-10.500.6(H)(1)(a), a property that is designated as LDR in the Frederick County Comprehensive Plan may contain three to six dwelling units per acre. Thus, a maximum of 1,674 dwelling units could be permitted for the Property with PUD zoning.

[CLEANWATER'S COUNSEL]: [W]ould the applicant please explain what greater public benefits the DRRA provides above and beyond those that would be otherwise obtainable absent the DRRA?

[PETITIONERS' COUNSEL]: A certainty that the project would not lose zoning, wouldn't lose density, wouldn't lose its comprehensive plan, a certainty as to what -- how the development will proceed in terms of the laws that are in effect when it goes to Phase I and in subsequent years.

You know, all of that is certainly public benefit, and that's the whole reason why, or one of the main reasons why these DRRAs are available to localities within the state.

[CLEANWATER'S COUNSEL]: And what you described certainly would reflect the certainty that the property owner would achieve as a result of the DRRA, but what are the greater public benefits in terms of infrastructure or other --

[PETITIONERS' COUNSEL]: I mean, it's one and the same.  That's the argument.  I mean, how is it to the greater good or how is it to public benefit, and by public meaning not just a property owner if the -- if the zoning can change willy-nilly, if property rights can be given and taken away based on, you know, whatever, you know, however the winds change.

I mean, it's Maryland law.  I mean, obviously it's -- the way common law in Maryland has developed it's that zoning is up for grabs unless there's valid -- unless there's recognizable vertical construction based on a validly issued building permit, and all the parties have tried to address this through legislation at the state in terms of vesting and this was the compromise.

And so obviously by virtue of there being a DRRA available to folks in the state it's -- to the public in the state it's to the greater public good. Otherwise, the state wouldn't have passed the law.  As my co[-]counsel . . . is referencing, I mean, the school site, the roads, the representations as to making all of the improvements that are required under the [Adequate Public Facilities Ordinance], I mean, it's all right here.  It's all spelled out in the DRRA.

Cleanwater's counsel also cross-examined Gugel about the DRRA and the following exchange occurred:

[CLEANWATER'S COUNSEL]: Under the DRRA is there anything in the -- what are [Petitioners'] responsibilities under the DRRA with respect to transportation improvements?

[] GUGEL: Nothing specific. It defers to what would be identified as part of a subsequent [Adequate Public Facilities Ordinance Letter of Understanding].

At different points during the hearing, Cleanwater's counsel questioned Gugel about the middle school site, and the following exchanges occurred:

[CLEANWATER'S COUNSEL]: Would this property owner be required to proffer the [] middle school site whether or not there is a DRRA in this case?

[] GUGEL: Well, the PUD, I mean it -- the new PUD regulations do give that discretion on requiring public site dedication. The old regulations were kind of on a per acre basis. But given the symbol on the site and the rezoning request, it would have been conditioned even without a DRRA.

\* \* \*

[CLEANWATER'S COUNSEL]: And under the school dedication requirement I just would like to confirm that there is no guarantee that the school site will be dedicated, it's contingent on acceptance by the Board of Education; is that correct?

[] GUGEL: Yeah, the site itself. I mean, the Phase I PUD does establish thresholds, timing thresholds of when that dedication and conveyance must occur.

[CLEANWATER'S COUNSEL]: But acceptance depends on the Board of Education?

[] GUGEL: Correct.

Gugel also testified that, "in the event that the Board of Ed[ucation] does not approve the public school site or determines not to accept conveyance then [Petitioners] shall retain fee simple ownership of the public school site and may use the public school site in a manner consistent with other uses in the project." At the conclusion of the hearing, the BOCC voted four-to-one to approve the DRRA.

On November 24, 2014, the BOCC enacted Ordinance No. 14-27-682, approving

Petitioners' PUD application and the Phase I Concept Plan for the development, subject to certain conditions ("the PUD Ordinance"). As discussed at the hearing before the BOCC, one of the conditions of the PUD Ordinance limited the number of dwelling units to be constructed in the development. Specifically, the PUD Ordinance provided that "[a] maximum of 675 dwelling units may be constructed, comprised of no more than 175 townhomes, and the remaining units being single-family detached." Another condition stated that the development needed to "[p]rovide a diversity of single[-]family lot sizes." Yet another condition concerned the middle school site, stating:

> [Petitioners] shall dedicate and convey to the County a 24.5+/- acre middle school site to the [Board of Education ("the BOE")], in fee simple, upon
>
> i) the recordation of the subdivision plat for the 100th lot in the Project or within two (2) years of the recordation of the subdivision plat for the 1st lot in the Project, whichever occurs first; and
>
> ii) [the] BOE's acceptance of the conveyance of land for the Public School Site. [Petitioners] and [the] BOE shall enter into a Memorandum of Understanding [], which shall set forth the rights and responsibilities of the parties in connection with development of the school site, prior to final, unconditional approval of the Phase II (Execution) Plan for the portion of the Project that contains the school site.

In the PUD Ordinance, another condition stated that Petitioners were to "[p]rovide two (2) neighborhood parks of at least 20,000 square feet each to be centrally located, with one in the northern land bay, and the other in the central land bay." And, consistent with the BOCC's vote at the hearing, the last condition of the ordinance provided that, "[w]ith the exception of structures on the Public School Site and models for the Project, neither Frederick County, nor any agency, department, division and/or branch thereof shall issue any structural building permits, prior to January 1, 2020."

- 8 -

On the same day, November 24, 2014, the final DRRA executed by Petitioners and the BOCC was recorded among the Land Records of Frederick County ("the Blentlinger DRRA"). We briefly summarize some of the Blentlinger DRRA's relevant provisions. Section 2.2A of the Blentlinger DRRA, concerning permissible uses and density, provides that the development shall be developed as a PUD in accordance with the provisions of the Frederick County Code, so long as the overall density and intensity of the development is not increased, and a maximum of 675 residential dwelling units are permitted pursuant to the PUD Ordinance. In Section 2.2C, Petitioners agree to comply with applicable laws should they revise the mix of residential unit types, subject to the cap of 675 residential dwelling units, and to pay any adjusted school construction fees resulting from a change in the unit types. In Section 2.2E, concerning limitation on building permit issuance, Petitioners "acknowledge[] and agree[] that[,]" "with the exception of structures on the Public School Site and models for the Project," "neither Frederick County, nor any agency, department, division and/or branch thereof shall issue any structural building permits, prior to January 1, 2020." In Section 2.4, Petitioners agree to make a payment to the County in lieu of building moderately priced dwelling units, as permitted by the Frederick County Code.

Article III of the Blentlinger DRRA sets forth the parties' agreement with respect to community facilities and infrastructure improvements. Section 3.1, concerning road improvements, provides that, to fulfill the Adequate Public Facilities Ordinance ("the

- 9 -

APFO") requirements,[6] Petitioners will either construct or fund construction of road improvements or contribute to escrow funds for road improvements. In Sections 3.2 and 3.3, Petitioners agree to comply with the sewer and water improvements as required by the APFO Letter of Understanding, and to pay tap fees in accordance with the fee schedule in effect at the time of building permit application.

Section 3.4 concerns schools. And, in Section 3.4A, Petitioners agree to pay the school construction fee as a condition of the APFO, notwithstanding the sunset of a school construction fee ordinance. Pursuant to Section 3.4B, all "[a]pplicable [s]chool [i]mpact [f]ees shall be paid at the time of the issuance of building permits in accordance with the fee schedule in effect at the time of the issuance of building permits." Section 3.4C concerns "[s]chool [s]ite [d]edication," and provides, in relevant part, as follows:

> [Petitioners] shall convey in fee simple to the Frederick County Board of Education ("BOE"), with no monetary consideration paid, the Public School Site shown on **EXHIBIT 6**, totaling a minimum of 24.5 ± buildable acres, to serve the Project and the surrounding region. The Public School Site will be conveyed to the BOE upon: i) the recordation of the first subdivision plat for lots in the Project; and ii) BOE's acceptance of the conveyance of land for the Public School Site. . . . A separate Memorandum of Understanding ("BOE MOU") between the BOE and [Petitioners] shall be executed prior to unconditional Phase II approval for residential dwelling units in the Project (assuming commercially reasonable efforts by both parties), which MOU shall establish and control other aspects of the Public School Site and the

---

[6]Chapter 1-20 of the Frederick County Code is the APFO. See FCC § 1-20-1 ("This chapter shall be known and cited as the 'Adequate Public Facilities Ordinance of Frederick County, Maryland.'"). Pursuant to FCC § 1-20-4, the APFO "is adopted with the intent that new residential, commercial, industrial and other development take place in accordance with the Frederick County Comprehensive Plan and the Capital Improvements Program and to ensure that adequate public facilities and services are reasonably available concurrent with new development so that orderly development and growth can occur." And, for purposes of the APFO, "public facilities shall include road, water, sewerage, and school facilities." Id.

rights and responsibilities of the parties relative to the Public School Site, and the construction of a public school. . . . In the event that the BOE does not approve the Public School Site or determines not to accept conveyance of the Public School Site, then [Petitioners] shall retain fee simple ownership of the Public School Site, and may use the Public School Site in a manner consistent with other uses with the Project.  [Petitioners] acknowledge[] that use of the Public School Site may require regulatory approvals, including but not limited to, revision of the [PUD] Ordinance.

(Emphasis in original).

As to property acquisition for public infrastructure, Section 3.5A provides:

In the event that some of the public infrastructure improvements, at the collector road or higher facility level, required by this DRRA or the APFO to be made by [Petitioners] will require the acquisition of public right-of-way from third-party property owners, [Petitioners] shall exercise commercially reasonable efforts to secure such right-of-way without the assistance of the County.

Section 3.5B provides that, if Petitioners demonstrate to the County that they are unable to secure a public right-of-way through commercially reasonable efforts, then Petitioners may request that the County or the State Highway Administration assist in such acquisition at Petitioners' "sole cost and expense."  Section 3.5B further provides that, should the County approve Petitioners' request for assistance, then the County or the State Highway Administration "shall have two years to acquire the needed right-of-way."  And, Section 3.5C provides that, if the County decides not to acquire the right-of-way, or the two-year time period of assistance has passed, then Petitioners "may be permitted to make a contribution to the County equal to the entire anticipated project development costs, which shall include but not be limited to costs for: design, engineering, right-of-way acquisition, management, inspection, etc. in lieu of constructing the public infrastructure improvements[,]" unless the applicable APFO letter of understanding provides otherwise.

Article IV of the Blentlinger DRRA, concerning the terms of the agreement, provides:

> This Agreement shall constitute covenants running with the land and shall run with and bind the Property so long as the Project is under development, provided that this Agreement shall terminate and be void twenty-five (25) years after the Effective Date of this Agreement unless extended by an amendment complying with all procedures required in this Agreement, the County Ordinance and the State law. The parties acknowledge and agree that the Term of this Agreement is justified by the: (1) substantial economic investment made and/or to be made by [Petitioners] for the development of the Project; (2) substantial investment in, and construction of, extensive public and private infrastructure by the parties; (3) public purposes to be advanced by development of the Project in accordance with the Development Laws; (4) uncertainty of future market demands and political pressures; and (5) expectations of the parties.

Article V of the Blentlinger DRRA concerns development review and Article VI concerns survival and transfer of obligations.

Article VII deals with breach of the Blentlinger DRRA and the parties' respective remedies. Section 7.1 concerns breach by Petitioners, and Section 7.1A provides that, if Petitioners fail or refuse to perform obligations under the Blentlinger DRRA, and fail to cure that default within a certain period of time, then the BOCC "may seek and obtain equitable relief to enforce the terms and conditions of th[e] Agreement[,] either through a decree for specific performance or an injunction." Section 7.1A further states that, if specific performance or an injunction is not available due to actions taken by Petitioners, "then the BOCC shall be entitled to bring a legal action for damages." In Section 7.1B, Petitioners waive the right to a "trial by jury in connection with any proceedings brought to enforce the terms of" the Blentlinger DRRA. Section 7.2A provides that the same remedies are available to Petitioners in the event of a breach by the BOCC. And, in Section

7.2B, the BOCC also waives the right to a jury trial.

Section 8.1A provides that Petitioners "shall comply with all Development Laws" as defined in the Blentlinger DRRA, stating:

> Except as otherwise specifically provided herein, the local laws, rules, regulations and policies governing the use, density or intensity of the Property, including but not limited to, those governing development, subdivision, growth management, impact fee laws, water, sewer, stormwater management, environmental protection, land planning and design, and adequate public facilities (hereafter collectively the "Development Laws"), shall be the local laws, rules, regulations and policies, if any, in force on the Effective Date of the Agreement, and [Petitioners] shall comply with all Development Laws.

And, Section 8.1B provides:

> If the BOCC determines that compliance with Development Laws enacted or adopted after the Effective Date of this Agreement is essential to ensure the health, safety or welfare of residents of all or part of Frederick County, the BOCC may impose the change in laws, rule, regulations and policies and the effect thereof upon the Property.

Section 8.3, concerning fees, states that, except as otherwise provided in the Blentlinger DRRA, Petitioners "shall pay all fees (specifically including but not limited to impact fees, school mitigation fees[,] and water and sewer connection fees) required by Frederick County at the rate in effect at the time the fee is due." Section 8.3 further states that, in the event that any of the fees are eliminated due to a change in the law and "replaced with a procedure or requirement that would impose some other burden on" Petitioners, then Petitioners "may elect to pay the impact fee in effect prior to the change in the law."

Section 9.7 of the Blentlinger DRRA, titled "Authority to Execute," states:

> The BOCC hereby acknowledges and agrees that all required notices, meetings, and hearings have been properly given and held by the County with respect to the approval of this Agreement, and [Petitioners] agree[] not

to challenge this Agreement or any of the obligations created by this Agreement on the grounds of any procedural infirmity or any denial of any procedural right. The BOCC hereby warrants and represents to [Petitioners] that the person(s) executing this Agreement on its behalf have been properly authorized to do so. [Petitioners] hereby warrant[] and represent[] to the BOCC (1) that [they are] the fee simple, record owner[s] of the Property, (2) that [they have] the right, power and authority to enter into this Agreement and to agree to the terms, provisions, and conditions set forth herein and to bind the Property as set forth herein, and (3) that all legal actions needed to authorize the execution, delivery and performance of this Agreement have been taken.

Finally, Section 9.12 of the Blentlinger DRRA, addressing appeals, states:

The County DRRA Ordinance allows any person aggrieved by this Agreement to file an appeal to the Circuit Court for Frederick County within 30 days of the date on which the parties execute the Agreement. If the effect of the decision of the Circuit Court revises this Agreement in any material way, then either party to this Agreement may terminate the Agreement by providing notice to all parties to this Agreement within 30 days of the date the Circuit Court decision becomes final and all appeals thereof have been finally determined, and, in this event, the other party so notified hereby agrees to mutually consent to the termination and to comply with all applicable laws concerning termination of a DRRA. Any such termination of this Agreement pursuant to this Section 9.12, shall not in any way affect the validity of any Development Approvals which have been obtained for the Project at the time of termination, including, but not limited to, APFO approvals.

Exactly thirty days after the Blentlinger DRRA was recorded, on December 24, 2014, Cleanwater filed in the Circuit Court for Frederick County ("the circuit court") a petition for judicial review, challenging, among other things, the validity of the PUD Ordinance and the Blentlinger DRRA. On June 8, 2015, Cleanwater filed a memorandum in support of the petition for judicial review. In relevant part, Cleanwater contended that the Blentlinger DRRA was void for lack of consideration because Petitioners had failed to provide "any 'enhanced public benefits' as consideration[.]" Cleanwater further argued

- 14 -

that the middle school site was subject to BOE approval, which was uncertain, and that, as such, "[t]here is no guarantee that the school site will be dedicated." (Emphasis omitted).

On August 21, 2015, Petitioners filed a memorandum in opposition to the petition for judicial review. Petitioners contended, in pertinent part, that the Blentlinger DRRA was supported by "adequate consideration." Also on August 21, 2015, the County filed a memorandum in response to Cleanwater's memorandum, arguing that substantial evidence supported the BOCC's approval of the PUD Ordinance, and that such approval fulfilled the requirements of State and County law. Although the County did not specifically address whether the Blentlinger DRRA was supported by adequate consideration, the County asserted that "[t]he decisions challenged by [Cleanwater, *i.e.*, the PUD Ordinance and the Blentlinger DRRA,] were approved by the BOCC based upon substantial evidence in the record and in accordance with applicable requirements of State and County law."

On September 14, 2015, Petitioners filed a reply memorandum, again contending that the Blentlinger DRRA was not supported by adequate consideration because there was no evidence in the agreement showing that the County provided vested rights in exchange for enhanced public benefits.

On September 28, 2015, the circuit court conducted a hearing on the petition for judicial review. On November 4, 2015, the circuit court entered an opinion and order affirming the BOCC's adoption of the PUD Ordinance and approval of the Blentlinger DRRA. The circuit court rejected the argument that the Blentlinger DRRA was not supported by adequate consideration, and concluded that the Blentlinger "DRRA imposes both binding obligations and legal detriment to" Petitioners.

- 15 -

On December 1, 2015, Cleanwater filed a notice of appeal. On February 3, 2017, in a reported opinion, the Court of Special Appeals reversed the judgment of the circuit court and remanded the case to the circuit court with instructions to vacate the Blentlinger DRRA. See Cleanwater Linganore, Inc. v. Frederick Cty., 231 Md. App. 620, 625, 643, 153 A.3d 874, 877, 888 (2017). In pertinent part, the Court of Special Appeals held that the Blentlinger DRRA was void for lack of consideration because it lacked any enhanced public benefits to the County. See id. at 625, 637, 153 A.3d at 877, 884. According to the Court of Special Appeals, many of the provisions of the Blentlinger DRRA

> do not reflect enhanced obligations of the developer. Rather, they reflect the obligations the developer would otherwise be required to satisfy during the course of the development of the property if no DRRA were in place. Indeed, the benefits relied upon by the developer (specifically those relating to road, sewer, water improvements, and tap fees) are required of the developer under the County's [APFO].

Id. at 639-40, 153 A.3d at 886. As to the middle school site, the Court of Special Appeals stated that it did not need to "decide whether the conveyance of a middle school site constitutes an enhanced public benefit to" the County, and explained:

> Because [Petitioners] retain[] fee simple ownership of the middle school site if the BOE "does not approve the Public School site or determines not to accept conveyance of the site," this "benefit," at the time of execution and recordation of the DRRA, was a conditional promise and potentially an illusory one to boot. Indeed, the offer by [Petitioners] to proffer the property in fee simple is not a definitive compulsory obligation to do anything other than offer the site for a middle school contingent on acceptance by the Board of Education.

Id. at 641, 642, 153 A.3d at 886, 887 (brackets omitted). The Court of Special Appeals ultimately determined that the Blentlinger DRRA conferred no enhanced public benefit to the County, and concluded:

As the developer's testimony and its counsel's argument reflects, the public benefit conferred by the [Blentlinger] DRRA consists of the developer's vested rights in the project and the applicant's obligations to satisfy . . . APFO[] infrastructure requirements. Clearly, every development must satisfy APFO requirements regardless of whether a DRRA is executed. A DRRA, in contrast, requires the applicant to provide some public benefit beyond complying with statutory land use standards and otherwise satisfy [APFO] infrastructure requirements. The [Blentlinger] DRRA [] does not require the applicant to unconditionally convey property for a middle school or otherwise provide any extra or enhanced benefit to Frederick County or its citizens. Accordingly, under the circumstances of this case, the [Blentlinger] DRRA is void for lack of consideration.

Id. at 643, 153 A.3d at 888.

Thereafter, Petitioners filed in this Court a petition for a writ of *certiorari*, raising the following two issues:

1.  Did the Court of Special Appeals err by holding that a DRRA, in order to be valid, must include "enhanced public benefits" to the local governing body?

2.  Did the Court of Special Appeals err by holding that Petitioners' proffer of a 24.5 +/- acre school site did not constitute adequate consideration for the DRRA, concluding instead that the proffer of the school site was a "conditional promise and potentially an illusory one to boot?"

On May 9, 2017, this Court granted the petition. See Blentlinger, LLC v. Cleanwater Linganore, 453 Md. 7, 160 A.3d 546 (2017).

**STANDARD OF REVIEW**

In Grasslands Plantation, Inc. v. Frizz-King Enters., LLC, 410 Md. 191, 203-04, 978 A.2d 622, 629 (2009), this Court set forth the standard of review that applies to an administrative agency's decision, stating:

When reviewing the decision of a local zoning body, . . . we evaluate directly the agency decision, and, in so doing, we apply the same standards

of review as the circuit court and intermediate appellate court. Our role is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law. In applying the substantial evidence test, we have emphasized that a court should not substitute its judgment for the expertise of those persons who constitute the administrative agency from which the appeal is taken. Our obligation is to review the agency's decision in the light most favorable to the agency, since their decisions are *prima facie* correct and carry with them the presumption of validity.

Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts. We are under no constraint, however, to affirm an agency decision premised solely upon an erroneous conclusion of law.

(Citations, brackets, and internal quotation marks omitted). See also Cty. Council of Prince George's Cty. v. Chaney Enters. Ltd. P'ship, 454 Md. 514, 528, 165 A.3d 379, 387 (2017) ("Judicial review of an administrative agency action is typically limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." (Citation and internal quotation marks omitted)). And, in Attar v. DMS Tollgate, LLC, 451 Md. 272, 279, 152 A.3d 765, 769 (2017), we explained that "we may not substitute our judgment for that of [the administrative agency] unless the agency's conclusions were not supported by substantial evidence or were premised on an error of law." (Citation omitted).

Because this case also involves statutory interpretation, we set forth the relevant rules of statutory construction:

The cardinal rule of statutory construction is to ascertain and effectuate the

intent of the General Assembly.

As this Court has explained, to determine that purpose or policy, we look first to the language of the statute, giving it its natural and ordinary meaning. We do so on the tacit theory that the General Assembly is presumed to have meant what it said and said what it meant. When the statutory language is clear, we need not look beyond the statutory language to determine the General Assembly's intent. If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written. In addition, we neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by the words that the General Assembly used or engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning. If there is no ambiguity in the language, either inherently or by reference to other relevant laws or circumstances, the inquiry as to legislative intent ends.

If the language of the statute is ambiguous, however, then courts consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives, and the purpose of the enactment under consideration. We have said that there is an ambiguity within a statute when there exist two or more reasonable alternative interpretations of the statute. When a statute can be interpreted in more than one way, the job of this Court is to resolve that ambiguity in light of the legislative intent, using all the resources and tools of statutory construction at our disposal.

If the true legislative intent cannot be readily determined from the statutory language alone, however, we may, and often must, resort to other recognized indicia—among other things, the structure of the statute, including its title; how the statute relates to other laws; the legislative history, including the derivation of the statute, comments and explanations regarding it by authoritative sources during the legislative process, and amendments proposed or added to it; the general purpose behind the statute; and the relative rationality and legal effect of various competing constructions.

In construing a statute, we avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense.

In addition, the meaning of the plainest language is controlled by the context in which it appears. As this Court has stated, because it is part of the context, related statutes or a statutory scheme that fairly bears on the fundamental issue of legislative purpose or goal must also be considered. Thus, not only are we required to interpret the statute as a whole, but, if appropriate, in the

context of the entire statutory scheme of which it is a part.

Bellard v. State, 452 Md. 467, 481-82, 157 A.3d 272, 280-81 (2017) (citation and brackets omitted).

## MOTION TO STRIKE

In this Court, the County filed a brief contending, for the first time, that to be valid a DRRA must be supported by enhanced public benefits, and arguing that the Blentlinger DRRA does not require any enhanced public benefit, and, thus, is invalid.[7] On brief, the County also asserts that "the absence of an enhanced public benefit has a particularly acute impact on the reserved legislative powers of the County in the present case because the scope of the Blentlinger[] DRRA exceeds that authorized by" the DRRA statute. The County maintains that Section 8.1A of the Blentlinger DRRA—*i.e.*, the "freeze provision"—exceeds the County's authority under the DRRA statute.

Petitioners filed in this Court a motion to strike the County's brief and a memorandum in support, contending, in pertinent part, that the County is judicially estopped from arguing that the Blentlinger DRRA is invalid and that the County's contention concerning the freeze provision of the Blentlinger DRRA is not properly before the Court. Specifically, Petitioners assert that, in the circuit court and the Court of Special Appeals, the County contended that the Blentlinger DRRA is valid; as such, Petitioners maintain that the County is judicially estopped from now changing its position and arguing

---

[7]Previously, only Cleanwater advanced this argument, challenging the Blentlinger DRRA's validity in the circuit court and the Court of Special Appeals. By contrast, the County argued in support of the Blentlinger DRRA's validity until proceedings in this Court.

that the Blentlinger DRRA is invalid. Petitioners also contend that any issue as to the freeze provision is not before this Court because the issue was not raised in a petition for a writ of *certiorari* or a cross-petition.

The County filed an opposition to the motion to strike, contending that judicial estoppel applies only where three circumstances are present, including where a party takes a factual position that is inconsistent with a position that it took in previous litigation. The County argues that it has not taken a factual position that is inconsistent with one that it took in previous litigation, and asserts that its change in position in the same litigation relates to the legal requirements governing the validity of a DRRA. The County maintains that it "raised the discussion of the freeze provision of the [Blentlinger] DRRA, not to create a separate issue for this Court to decide, but for the purpose of showing that the prejudice to the County of not requiring a DRRA to contain enhanced public benefits is particularly acute[.]" Cleanwater also filed an opposition to the motion to strike "join[ing] in" the County's opposition.

On August 30, 2017, this Court issued an order providing "that action on the motion [to strike] be, and it is hereby, deferred pending oral argument." We now address the motion to strike, and we deny the motion. It is undisputed that, up until proceedings in this Court, in the circuit court and the Court of Special Appeals, the County took the position that the Blentlinger DRAA is valid. Indeed, on brief, the County readily acknowledges that in arguing that the Blentlinger DRRA is invalid it "has changed its position in this case from that which it argued before the [c]ircuit [c]ourt and [the] Court of Special Appeals."

Judicial estoppel has been defined as "a principle that precludes a party from taking

a position in a subsequent action inconsistent with a position taken by him or her in a previous action." Dashiell v. Meeks, 396 Md. 149, 170, 913 A.2d 10, 22 (2006) (citation and internal quotation marks omitted). "[J]udicial estoppel applies when it becomes necessary to protect the integrity of the judicial system from one party who is attempting to gain an unfair advantage over another party by manipulating the court system." Id. at 171, 913 A.2d at 23. To that end,

> [b]efore judicial estoppel may be applied, three circumstances must exist: (1) one of the parties takes a [] position that is inconsistent with a position it took in previous litigation, (2) the previous inconsistent position was accepted by a court, and (3) the party who is maintaining the inconsistent positions must have intentionally misled the court in order to gain an unfair advantage.

Id. at 171, 913 A.2d at 22 (citation omitted). In Underwood-Gary v. Mathews, 366 Md. 660, 667 n.6, 785 A.2d 708, 712 n.6 (2001), this Court noted that "[j]udicial estoppel has been defined as a principle that precludes a party from taking a position in a **subsequent action** inconsistent with a position taken by him or her in a **previous action**." (Emphasis added) (citation omitted). And, in Mona v. Mona Elec. Grp., Inc., 176 Md. App. 672, 726, 934 A.2d 450, 481 (2007), reconsideration denied (Nov. 26, 2007), the Court of Special Appeals concluded that judicial estoppel did not apply, explaining, in relevant part:

> Mark's claim in this case . . . is not inconsistent with any position taken in *previous litigation*. Indeed, there was no "previous litigation." Instead of pointing to *previous litigation* in which Mark took an inconsistent position, MEG complains that Mark took inconsistent positions within *this litigation*. Specifically, MEG argues that, at the outset of this case, Mark alleged that MEG was legally obligated to pay a dividend in order to cover any debts he owed to MEG, but that assertion is inconsistent with Mark's later assertion that MEG acted illegally in making deductions from those dividends to cover his alleged debts. As MEG acknowledges, however, any inconsistency in Mark's position occurred within this litigation. Accordingly, the doctrine of judicial estoppel does not apply.

(Emphasis in original). In other words, judicial estoppel applies where a party takes a position in subsequent litigation that is inconsistent with one taken in previous litigation, not where a party takes an inconsistent position within the same litigation.

Here, we conclude that the prerequisites that must exist before judicial estoppel may be applied are not satisfied. In our view, the County's change in position occurs in the same litigation; in other words, the County did not take a position in a previous action or litigation and then change that position in new litigation. And, there is no evidence whatsoever in the record that the County intentionally misled the court to gain an unfair advantage. Given that the first and third prerequisites for the application of judicial estoppel are not established, we need not address the remaining circumstance, *i.e.*, whether the previous inconsistent position was accepted by the court.

As to the contention that the County is raising a new issue concerning the validity of the freeze provision and that the issue is not properly before the Court, to the extent that the County is raising such an issue, we shall decline to consider any question as to the validity of the freeze provision in the Blentlinger DRRA. Notably, the County contends that it is not challenging the validity of the freeze provision, but rather it is arguing that the existence of the freeze provision is prejudicial in light of the alleged lack of adequate consideration, *i.e.*, enhanced public benefits. Nonetheless, we observe that none of the parties raised any issue as to the validity of the freeze provision in a petition for a writ of *certiorari* or a cross-petition. Accordingly, the issue is not properly before this Court. See Md. R. 8-131(b)(1) ("Unless otherwise provided by the order granting the writ of certiorari, in reviewing a decision rendered by the Court of Special Appeals . . . , the Court of Appeals

ordinarily will consider only an issue that has been raised in the petition for certiorari or any cross-petition and that has been preserved for review by the Court of Appeals."); Vito v. Grueff, 453 Md. 88, 126 n.9, 160 A.3d 592, 614 n.9 (2017) (This Court noted that an "issue was not squarely addressed by the circuit court, nor raised by [the party] in a cross-petition for a writ of *certiorari*. Thus, the issue is not properly preserved for our review."). To the extent that any issue as to the freeze provision is, as the County posits, simply a point made in support of the contention that, in order to be valid, a DRRA must be supported by enhanced public benefits, there is no reason to grant the motion to strike the County's brief on that ground.

As a final point, Petitioners argue that the County's brief should be stricken because the County relies on facts and exhibits outside of the record—specifically, facts about the 2014 County election. Although information about the 2014 County elections is included in the County's brief ostensibly to explain its change in position with respect to the validity of the Blentlinger DRRA, because that information is not relevant to the issues before the Court in this case, we need not consider it. As such, we conclude that the inclusion of information regarding the 2014 election does not warrant granting the motion to strike.

## DISCUSSION[8]

### The Parties' Contentions

Petitioners contend that to be valid a DRRA need not include a provision requiring

---

[8]Although Petitioners raised two issues in the petition for a writ of *certiorari* and on brief in this Court—namely, whether a DRRA is required to confer enhanced public benefits to the County, and whether the Blentlinger DRRA is supported by adequate consideration—we consolidate the two issues for purposes of this opinion.

that enhanced public benefits be bestowed upon a local governing body, and, thus, the BOCC did not err in approving the Blentlinger DRRA, as there was sufficient consideration. Petitioners argue that neither the plain language of the DRRA statute, nor the County's statutes governing DRRAs, nor the legislative history of the DRRA statute, includes the term "enhanced public benefits" or requires that a DRRA include enhanced public benefits. Petitioners assert that, because the DRRA statute and the County's statutes governing DRRAs are unambiguous and clearly do not require a DRRA to include enhanced public benefits to a local governing body, our analysis should end there. Petitioners maintain that Court of Special Appeals's reliance on Queen Anne's Conservation, Inc. v. Cty. Comm'rs of Queen Anne's Cty., 382 Md. 306, 322, 855 A.2d 325, 334 (2004), is misplaced because that case did not address the consideration that is needed for a DRRA to be valid and mentioned the term "enhanced public benefits" only in *dicta*.

Petitioners assert that they have undertaken "significant commitments" in the Blentlinger DRRA, including the proffer of the middle school site, as well as detriments, which constitute sufficient consideration for the Blentlinger DRRA. Petitioners maintain that the Blentlinger DRRA creates binding obligations on them that provide many benefits to the County, including, for example, Petitioners' agreement to pay school impact fees, as well as pay water and sewer capacity fees, and Petitioners' agreement to secure public rights-of-way from third-party property owners without assistance from the County. Petitioners contend that the County also received other benefits, such as "certainty as to the timing and scope of the development of the project over the span of twenty-five []

years." Petitioners argue that, in addition to being subjected to binding obligations, they incurred detriments under the Blentlinger DRRA, including, for example, a limit on the number of residential dwelling units to be built, and a waiver of the right to challenge the Blentlinger DRRA or any of its obligations on the ground of any procedural infirmity or any denial of a procedural right. Petitioners assert that the middle school site proffer is an additional benefit to the County and the BOE, and serves as additional consideration supporting the Blentlinger DRRA. Petitioners maintain that even a conditional promise constitutes consideration for a contract, and that their promise to proffer the middle school site constitutes consideration for the Blentlinger DRRA.

Cleanwater responds that the plain language and legislative history of the DRRA statute, as well as case law, lead to the conclusion that enhanced public benefits as consideration are required for a DRRA to be valid. Specifically, Cleanwater contends that LU § 7-303(a)(9) requires the local governing body to obtain enhanced public benefits from the developer in exchange for conferring vested rights. Cleanwater argues that enhanced public benefits are benefits, "secured in the public interest, in excess of those that a developer would be required to provide in the ordinary course of development." Cleanwater asserts that, in Queen Anne's Conservation, 382 Md. at 322, 855 A.2d at 334, this Court expressly stated that a DRRA must be made "in consideration of enhanced public benefits[,]" which is consistent with the DRRA statute's legislative history.

Cleanwater contends that the Court of Special Appeals correctly held that the Blentlinger DRRA was not supported by sufficient consideration due to the lack of an enhanced public benefit to the County. Cleanwater argues that the middle school site

proffer does not constitute consideration because it was a condition of rezoning, and would have been required even absent a DRRA. Cleanwater asserts that, because the middle school site was required for Petitioners to secure rezoning of the Property, the middle school site did not serve as an enhanced public benefit given in exchange for the Blentlinger DRRA. Cleanwater also maintains that the other benefits identified by Petitioners are required under the APFO and other statutes, and thus do not constitute enhanced public benefits. In sum, Cleanwater contends that the County received nothing from Petitioners in exchange for the Blentlinger DRRA, and that, as such, the Blentlinger DRRA is "void for lack of consideration (*i.e.*, enhanced public benefits)."

Like Cleanwater, the County responds that a DRRA must bestow enhanced public benefits upon a local governing body. Also like Cleanwater, the County relies on Queen Anne's Conservation to support its position, and argues that the Blentlinger DRRA imposes no obligation on Petitioners that the PUD Ordinance did not already impose, and does not impose any obligation on Petitioners that is not otherwise required by law.

**Consideration for Contracts**

In Cheek v. United Healthcare of Mid-Atl., Inc., 378 Md. 139, 147-49, 835 A.2d 656, 661-62 (2003), we discussed consideration for a contract in some detail, stating:

> To be binding and enforceable, contracts ordinarily require consideration. In Maryland, consideration may be established by showing a benefit to the promisor or a detriment to the promisee. In particular, we have recognized that for[]bearance to exercise a right or pursue a claim, can constitute sufficient consideration to support an agreement.

> A promise becomes consideration for another promise only when it constitutes a binding obligation. Without a binding obligation, sufficient consideration does not exist to support a legally enforceable agreement.

An illusory promise appears to be a promise, but it does not actually bind or obligate the promisor to anything. An illusory promise is composed of words in a promissory form that promise nothing. They do not purport to put any limitation on the freedom of the alleged promisor. If A makes an illusory promise, A's words leave A's future action subject to A's own future whim, just as it would have been had A said nothing at all. Similarly, the Restatement of Contracts explains that words of promise which by their terms make performance entirely optional with the promisor whatever may happen, or whatever course of conduct in other respects he may pursue, do not constitute a promise. Likewise, the promise is too indefinite for legal enforcement is the promise where the promisor retains an unlimited right to decide later the nature or extent of his performance. The unlimited choice in effect destroys the promise and makes it merely illusory.

(Citations, brackets, ellipsis, and internal quotation marks omitted). See also Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc., 178 Md. App. 328, 384-85, 941 A.2d 1181, 1213, cert. denied, 405 Md. 63, 949 A.2d 652 (2008) ("In Maryland, consideration may be established by showing a benefit to the promisor or a detriment to the promisee." (Citation and internal quotation marks omitted)).

And, in Vogelhut v. Kandel, 308 Md. 183, 190-91, 517 A.2d 1092, 1096 (1986), we stated that "[i]t is basic contract law that courts generally will not inquire as to the adequacy of consideration[,]" explaining:

The policy behind this rule was best expressed [in a previous case]:

It is not the province of the Courts to interfere with the natural right of parties to contract, and to exercise their own will and judgment upon the subject; and they will have the power to estimate the value of the consideration and the benefits to be derived from their contracts, where there is no incompetency to contract, no fraud or surprise, and no rule of law is violated.

It follows, therefore, that anything which fulfills the requirement of consideration, that is, one recognized as legal, will support a promise, whatever may be the comparative value of the consideration and of the thing

- 28 -

promised.  A benefit to the promisor or a detriment to the promisee is sufficient valuable consideration to support a contract.  Legal detriment means giving up something which immediately prior thereto the promisee was privileged to retain, or doing or refraining from doing something which he was then privileged not to do, or not to refrain from doing.

(Citations and internal quotation marks omitted).

## Requirements of DRRAs

LU § 7-303 sets forth both the required and permissible contents of a DRRA, providing in full as follows:

(a) *Required contents*. — A development rights and responsibilities agreement shall include:

(1) a legal description of the real property subject to the agreement;
(2) the names of the persons having a legal or equitable interest in the real property subject to the agreement;
(3) the duration of the agreement;
(4) the permissible uses of the real property;
(5) the density or intensity of use of the real property;
(6) the maximum height and size of structures to be located on the real property;
(7) a description of the permits required or already approved for the development of the real property;
(8) a statement that the proposed development is consistent with the comprehensive plan and development regulations of the local jurisdiction;
(9) a description of the conditions, terms, restrictions, or other requirements determined by the local governing body of the local jurisdiction to be necessary to ensure the public health, safety, or welfare; and
(10) to the extent applicable, provisions for the:
        (i) dedication of a portion of the real property for public use;
        (ii) protection of sensitive areas;
        (iii) preservation and restoration of historic structures; and
        (iv) construction or financing of public facilities.

(b) *Permissible contents*. — An agreement may:

(1) set the time frame and terms for development and construction on

the real property; and
(2) provide for other matters consistent with this division.

LU § 7-305 sets forth the procedures and process governing a DRRA, including that a public hearing must be held, that the local planning commission must review the proposed DRRA to determine whether it is consistent with the local jurisdiction's comprehensive plan, and that a DRRA must be recorded in the land records of the local jurisdiction within twenty days after the DRRA is executed.

LU § 7-302(a) authorizes the local governing body of a local jurisdiction to, "by local law, establish procedures and requirements for the consideration and execution of agreements; and [] delegate all or part of the authority established under the local law to a public principal within the jurisdiction of the local governing body." (Paragraph break omitted).[9] To that end, the County has established procedures and requirements for the consideration and execution of DRRAs. The County's DRRA ordinance's requirements for a DRRA mirror, in large part, LU § 7-303. Specifically, FCC § 1-25-4 provides:

> (A) At a minimum, a development rights and responsibilities agreement shall contain the following:
>
> (1) A lawyer's certification that applicant has either a legal or equitable interest in the property;
> (2) The names of all persons having an equitable or legal interest in the property, including lien holders;
> (3) A legal description of the property subject to the agreement;
> (4) The duration of the agreement;
> (5) The permissible uses of the property;
> (6) The density or intensity of use of the property;
> (7) The maximum height and size of structures to be located on the

---

[9]Notably, however, LU § 7-306 provides: "This subtitle does not require the adoption of a local law by a local governing body or authorize a local governing body to require a party to enter into an agreement."

property;

(8) A description of permits required or already approved for the development of the property;

(9) A statement that the proposed development plan is consistent with the Comprehensive Plan and all applicable county regulations;

(10) A description of the conditions, terms, restrictions or other requirements determined by the county to be necessary to ensure the public health, safety or welfare; and

(11) To the extent applicable, provisions for the:

> (a) Dedication of a portion of the property for public use;
>
> (b) Protection of sensitive areas;
>
> (c) Preservation and restoration of historic structures;
>
> (d) Construction or financing of public facilities; and
>
> (e) Responsibility for attorney's fees, costs, and expenses incurred by the county in the event an agreement is abandoned or breached by the applicant.

(B) An agreement may contain other terms, provisions, requirements and agreements concerning the property which may be agreed upon by the county and the applicant.

(C) An agreement may fix the time frame and terms for development and construction on the property.

(D) An agreement may provide for other matters consistent with this chapter.

(E) All persons with a lien interest in the property must execute the agreement.

(F) Any superior interest with a power of sale must be subordinated to the position of the county or acceptable financial guarantees must be provided.

**Analysis**

Here, we hold that, based on the plain language and legislative history of the DRRA statute, as well as relevant case law, to be valid a DRRA is not required to confer an enhanced public benefit upon a local governing body, *i.e.*, a county. Stated otherwise, there is no evidence in the DRRA statute, its legislative history, or case law demonstrating an intent to require an enhanced public benefit as part of a DRRA. Nothing in FCC § 1-25-4

requires that a DRRA in Frederick County be supported by enhanced public benefits. Thus, we hold that the Blentlinger DRRA is not required to confer any enhanced public benefit to the County, and is supported by sufficient consideration.

We begin by examining the plain language of the DRRA statute. LU § 7-303(a), the relevant statute, sets forth the required contents of a DRRA. By its plain language, LU § 7-303(a) requires certain detailed items to be included in a DRRA, but an enhanced public benefit, or even a public benefit, is not identified among those required contents. Rather, LU § 7-303(a) requires a DRRA to include, among other things, a legal description of the real property subject to the DRRA, the duration of the DRRA, the density or intensity of use of the real property, and a statement that the proposed development is consistent with the local jurisdiction's comprehensive plan and development regulations. Significantly, LU § 7-303(a) does not mention, as one of the items that must be included in a DRRA, a requirement that a DRRA be supported by enhanced public benefits. Indeed, the term "enhanced public benefit" appears nowhere in LU § 7-303(a) or elsewhere in the DRRA statute, nor does the term "public benefit." In short, the plain language of LU § 7-303(a) is unambiguous—an enhanced public benefit is not a requirement of a DRRA.

Notwithstanding Cleanwater's and the County's contentions, we are unconvinced that LU § 7-303(a)(9) requires a DRRA to include an enhanced public benefit. LU § 7-303(a)(9) provides: "A [DRRA] shall include: [] a description of the conditions, terms, restrictions, or other requirements determined by the local governing body of the local jurisdiction to be necessary to ensure the public health, safety, or welfare[.]" (Paragraph break omitted). LU § 7-303(a)(9)'s plain language is unambiguous, and merely requires

the local governing body to determine, and include in the DRRA, a description of what it has determined to be necessary to ensure the public health, safety, or welfare. Tellingly, LU § 7-303(a)(9) does not require that a local governing body determine that any specifically identified condition, term, restriction, or other requirement is necessary to ensure the public health, safety, or welfare, or indicate in any way that a condition, term, restriction, or other requirement to ensure the public health, safety, or welfare constitutes an enhanced public benefit ,or even a public benefit. We decline to read into the DRRA statute, and, specifically, LU § 7-303(a)(9), a requirement that is not evidenced by the clear language and plain meaning of the statute—*i.e.*, we will not add words to the unambiguous DRRA statute to reach the strained result that Cleanwater and the County advocate. See Bellard, 452 Md. at 481, 157 A.3d at 280 ("[W]e neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by the words that the General Assembly used or engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning." (Citation omitted)).

Similarly, nothing in FCC § 1-25-4(A) requires a DRRA to provide for an enhanced public benefit. Like LU § 7-303(a), FCC § 1-25-4(A) sets forth the various requirements of a DRRA in the County, including, for example, the requirements that the DRRA contain a legal description of the property subject to the DRRA, the duration of the DRRA, and the density or intensity of use of the property. Unlike LU § 7-303(a), FCC § 1-25-4(A)(1) also requires that a DRRA contain "[a] lawyer's certification that applicant has either a legal or equitable interest in the property[.]" That additional requirement is very different from setting forth a requirement that a DRRA in the County include enhanced public benefits.

- 33 -

In short, nothing in LU § 7-303(a)'s or FCC § 1-25-4(A)'s plain language purports to include enhanced public benefits, or public benefits, as required content of a DRRA.

Although the plain language of LU § 7-303(a) and FCC § 1-25-4(A) is unambiguous—and clearly does not require enhanced public benefits as part of a DRRA generally or in the County specifically—and our analysis could end at this point, we nonetheless point out that our holding is fully supported by the legislative history and purpose of the DRRA statute. See Lamone v. Schlakman, 451 Md. 468, 496, 153 A.3d 144, 161 (2017) ("Although the language of the statute is clear, a brief review of legislative history of relevant [statutory] provisions . . . provides a context for our holding and confirms our interpretation of the statute."). A review of the DRRA statute's legislative history reinforces our conclusion that a DRRA is not required to confer enhanced public benefits to the county. Stated otherwise, a review of the DRRA's statute legislative history does not change the result or alter the plain meaning of LU § 7-303(a). The legislative history of the DRRA statute demonstrates that, in 1995, through House Bill 700, the General Assembly codified the use of development agreements when it enacted the DRRA statute. See 1995 Md. Laws 3242 (Vol. V, Ch. 562, H.B. 700). House Bill 700's bill file reveals that one of the main purposes of House Bill 700 was to permit vesting of rights through the use of DRRAs.

To that end, in a bill analysis of House Bill 700, the House Commerce and Government Committee explained House Bill 700's background in detail as follows:

> In a briefing paper provided by the Institute for Governmental Service, it was found that vested rights are defined legally in three ways: through common law, often under the principle of equitable estoppel; through just

compensation and takings requirements in the federal and state constitutions; and through legislation.  In focusing on the legislative remedies, the Institute found that states have used two approaches to solve the vesting problem: (1) prohibiting local governments from applying new regulations to on-going projects by defining when vesting occurs, and (2) authorizing the use of development agreements.

To date, at least ten states have authorized development agreements in one form or another. . . . In Maryland, Montgomery County uses development agreements somewhat similar to those envisioned by this legislation.

Development agreements can provide benefits for both developers and local governments.  For the developer, a development agreement establishes the rules and regulations which will govern the project throughout its construction, and perhaps beyond.   For the local government, the development agreement provides for greater certainty in the comprehensive planning process, as well as an opportunity to ensure the provision of necessary public facilities.

In Maryland, the Court of Appeals ruled in 1993 (Prince George's County vs. Sunrise Development[, 330 Md. 297, 623 A.2d 1296 (1993)]) that development rights do not vest in a property until construction begins on a structure that is visible to the general public.  The effect of the ruling is to give a local government the ability to change a permissible land use until very late in the land use approval process.  In fact, a change could occur after the issuance of a building permit, typically the last stage in the approval process.

A similar bill was introduced in the 1994 session as House Bill 990.  House Bill 990 received an unfavorable report from this committee.  A workgroup was established in the interim which led to the development of House Bill 700.  The workgroup consisted [of] the following representatives: Linowes and Blocher; Fossett and Brugger; Maryland Builder's Association; Suburban Maryland Building Industry Association; Maryland Association of Counties; Maryland Municipal League; Calvert County Commissioner; Charles County Attorney; Chair of the State Economic Growth, Resource Protection, and Planning Commission; and the Critical Areas Commission.

H. Commerce and Gov't Comm., Bill Analysis, H.B. 700 (1995 Md. Leg. Sess.), at 3.

Similarly, in another bill analysis of House Bill 700, the Senate Economic and

Environmental Affairs Committee explained House Bill 700's background, in pertinent

part, as follows:

> The Maryland Court of Appeals has ruled that development rights do not vest in a property until construction begins on a structure that is visible to the general public. Prince George's County v. Sunrise Development, 330 Md. 297 (1993). This ruling gives a local government the ability to change a permissible land use until very late in the land use approval process. Because development rights have not yet vested, a change could occur even after the issuance of a building permit which is typically the last stage in the approval process.

> . . . In focusing on the legislative remedies to the problem of vesting presented by the Sunrise Development case, the Institute [for Governmental Service] found that states have used two approaches to solve the problem: 1) prohibiting local governments from applying new regulations to on-going projects by defining when vesting occurs; and 2) authorizing the use of development agreements.

> Development agreements can provide benefits for both developers and local governments. For the developer, a development agreement establishes the rules and regulations which will govern the project throughout its construction, and perhaps beyond. For the local government, the development agreement provides for greater certainty in the comprehensive planning process, as well as an opportunity to ensure the provision of necessary public facilities.

> . . .

> House Bill 700 received a favorable report by the House Commerce and Government Matters Committee which was adopted with floor amendments and passed the House of Delegates (123-9) on March 20, 1995.

S. Econ. and Env't Affairs Comm., Bill Analysis, H.B. 700 (1995 Md. Leg. Sess.), at 2-3.

In a floor report of House Bill 700, the Senate Economic and Environmental Affairs

Committee summarized House Bill 700 as follows:

> House Bill 700 authorizes all municipalities exercising zoning and planning powers and all counties, except Prince George's County, to enact ordinances providing for [DRRAs]. The purpose of an agreement is to establish the conditions under which development of real property may proceed for a specified time period. The bill requires an agreement to include specific

elements, for example, the permissible uses of the real property, the density or intensity of use, the maximum height and size of structures, a description of the permits required or already approved for the development of the property, and a statement that the proposed development is consistent with the plan and development regulations of the jurisdiction. To the extent applicable, an agreement may contain provisions for the dedication of a portion of the property for a public use, preservation of sensitive areas, preservation and restoration of historic structures, and construction or financing of public facilities.

The bill requires a public hearing prior to the execution of an agreement. Unless otherwise provided by the parties to an agreement, the agreement becomes void five years after the date on which it is executed. In addition, the parties to an agreement may terminate it by mutual consent. The agreement may be modified with the mutual consent of the parties to the agreement or if the jurisdiction finds that modification is essential for the public health, safety, or welfare.

S. Econ. and Env't Affairs Comm., Floor Report, H.B. 700 (1995 Md. Leg. Sess.), at 1.

Ultimately, in 1995, the General Assembly enacted the DRRA statute for the following purposes:

FOR the purpose of authorizing certain local governments . . . to enter and amend [DRRAs] with certain persons; authorizing the local governments to establish, by ordinance, certain procedures and requirements for the consideration, execution, and amendment of [DRRAs]; requiring certain procedures before entering and amending [DRRAs]; requiring [DRRAs] to contain certain provisions; establishing that under certain conditions a [DRRA] is void after a certain number of years; authorizing the parties to a [DRRA] to suspend or terminate the agreement under certain circumstances; authorizing the local government to unilaterally suspend or terminate a [DRRA] under certain circumstances; establishing that certain laws, rules, regulations, and policies shall govern [DRRAs] under certain circumstances; providing that the recording of an agreement within a certain number of days has a certain effect; establishing the rights of parties to enforce a [DRRA]; defining certain terms; providing for the application of certain provisions of this Act; providing that this Act is not intended to abrogate certain laws, except under certain circumstances; providing that this Act is not intended to abrogate certain powers of certain local governments; and generally relating to [DRRAs].

1995 Md. Laws 3242 (Vol. V, Ch. 562, H.B. 700) (italics and underlining omitted). The statute governing the required content of DRRAs, originally enacted as Md. Code (1957, 1995 Repl. Vol.), Art. 66B, § 13.01(f), provided in its entirety as follows:

(f) *Contents of agreement.* — (1) An agreement shall include:

(i) A legal description of the real property subject to the agreement;
(ii) The names of the persons having a legal or equitable interest in the real property subject to the agreement;
(iii) The duration of the agreement;
(iv) The permissible uses of the real property;
(v) The density or intensity of use;
(vi) The maximum height and size of structures;
(vii) A description of the permits required or already approved for the development of the real property;
(viii) A statement that the proposed development is consistent with the plan and development regulations of the jurisdiction;
(ix) A description of the conditions, terms, restrictions, or other requirements determined by the governing body of the jurisdiction as necessary to ensure the public health, safety, or welfare; and
(x) To the extent applicable, provisions for the:
    1. Dedication of a portion of the real property for public use;
    2. Protection of sensitive areas;
    3. Preservation and restoration of historic structures; and
    4. Construction or financing of public facilities.

(2) An agreement may:

(i) Fix the period in and terms by which development and construction may commence or be completed; and
(ii) Provide for other matters consistent with this article.

Significantly, Md. Code (1957, 1995 Repl. Vol.), Art. 66B, § 13.01(f) did not include an enhanced public benefit as a requirement of a DRRA, and did not even mention the term "enhanced public benefit." Thereafter, in 2012, Md. Code (1957, 1995 Repl. Vol.), Art. 66B, § 13.01(f) was recodified in Title 7 of the new Land Use Article; at that time, Md. Code (1957, 1995 Repl. Vol.), Art. 66B, § 13.01(f) became LU § 7-303 without substantive

change.  See 2012 Md. Laws 2157, 2291-92 (Vol. IV, Ch. 426, H.B. 1290).  Indeed, the Revisor's Note to LU § 7-303 states that the "section formerly was Art. 66B, § 13.01(f)[,]" and that "[t]he only changes are in style."  LU § 7-303 has remained unchanged since 2012.

What we discern from this legislative history is that the DRRA statute has never required, and was not intended to require, a DRRA to confer enhanced public benefits to the county to be valid.  In other words, the DRRA statute's legislative history fails to demonstrate that the provision of enhanced public benefits by the developer to the county is a requirement of a DRRA.  There is simply nothing in House Bill 700's bill file to suggest that a purpose of House Bill 700, and ultimately the DRRA statute, was to ensure that local governing bodies received enhanced public benefits from developers.  Importantly, the term "enhanced public benefits" does not appear anywhere in House Bill 700's bill file or in the DRRA statute as enacted.  And, as demonstrated by the various bill analyses, the main purposes of House Bill 700 were to fix the problem of vesting caused by this Court's holding in Sunrise Development, 330 Md. 297, 623 A.2d 1296, and to allow developers and local governments to enter into DRRAs, which not only solved the vesting problem, but also resulted in mutually beneficial agreements through which both the developers and local governments achieved important goals.

As recognized by both the House Commerce and Government Committee and the Senate Economic and Environmental Affairs Committee, a benefit of a DRRA to the local government is that a DRRA "provides for greater certainty in the comprehensive planning process, as well as an opportunity to ensure the provision of necessary public facilities." However, these statements concerning the benefit to the local government speak only to

the local government's ability to ensure the provision of "necessary public facilities," not the local government's ability to ensure "enhanced public benefits." And, nothing in these statements leads to a conclusion that "necessary public facilities" was intended to be the equivalent of "enhanced public benefits." Moreover, tellingly, in the Senate Economic and Environmental Affairs Committee's floor report of House Bill 700, in summarizing House Bill 700 and outlining House Bill 700's requirements for DRRAs, the provision of enhanced public benefits is not identified as an example of a specific item that must be included in a DRRA.

To be sure, House Bill 700's bill file includes a letter dated March 3, 1995, submitted by Maryland Association of Counties, Incorporated ("the Association") to the House Commerce and Governmental Matters Committee, in which the Association stated that it supported House Bill 700, and explained that House Bill 700 "solves two problems":

> First, it clarifies that local governments already have the authority to establish developers agreements that define the terms and conditions of project approvals. . . .

> Second, a recent Supreme Court decision, see <u>Dolan v. Tigard</u>[,] 114 S. Ct. 2309 (1994), may unnecessarily limit the ability of a local government acquiring additional public benefits from a developer during development project approval negotiations. The new "rough proportionality" test described by <u>Dolan</u> may restrict a community from securing a greater amount of desirable open space, density concessions, public infrastructure, or facility construction as part of project approval.

Significantly, although the Association mentioned "additional public benefits," and seemingly provided examples of what it considered to be additional public benefits, such as "a greater amount of desirable open space, density concessions, public infrastructure, or facility construction as part of project approval[,]" the General Assembly did not amend

House Bill 700 to provide, as a requirement for a DRRA, the inclusion of additional or enhanced public benefits to the county. Indeed, neither the examples that the Association provided, nor the term "additional public benefits," appeared in the original DRRA statute's requirements for the contents of a DRRA.

We reiterate the obvious point that, had it desired to do so, the General Assembly could have required a DRRA to be supported by enhanced public benefits. Cf. Bottini v. Dep't of Fin., 450 Md. 177, 206, 147 A.3d 371, 389 (2016) ("[T]he General Assembly could have identified a bank account and the funds contained in a bank account as a separate classification of property subject to forfeiture, or as a specific form of tangible or intangible personal property distinct from money, had it desired to do so." (Citation omitted)); Montgomery Cty. v. Phillips, 445 Md. 55, 76, 124 A.3d 188, 200 (2015) ("Tellingly, the General Assembly could have, but did not, modify or otherwise raise the tax ceiling on the combined State agricultural land transfer tax and county agricultural land transfer tax that may be imposed."). Presumably, had the General Assembly intended to include the requirement that a DRRA be supported by enhanced public benefits, the General Assembly would have taken care to define the term "enhanced public benefit," or otherwise delineate what would constitute an enhanced public benefit. Absent any indication in the relevant statutory language or the legislative history that the General Assembly intended that a DRRA be supported by enhanced public benefits, we decline to construe the DRRA statute to reach such a strained result.

Importantly, nothing in case law that has been issued after the enactment of the DRRA statute leads to the conclusion that a DRRA must be supported by enhanced public

benefits. Significantly, the term "enhanced public benefits" appears in only one opinion by this Court, Queen Anne's Conservation, 382 Md. at 322, 855 A.2d at 334, and was repeated later by the Court of Special Appeals in Cleanwater Linganore, Inc. v. Frederick Cty. ("Casey"), 231 Md. App. 373, 392, 151 A.3d 44, 55 (2016), and in its opinion in this case. In Queen Anne's Conservation, 382 Md. at 310, 311, 855 A.2d at 327, 328, this Court considered "the correct path to be followed by a person or entity, not a party to a DRRA, but who feels aggrieved by the execution of the agreement, in obtaining scrutiny of the legal bona fides of the DRRA[,]" and held that the "[a]ppellants, in pursuing a challenge to the execution of the DRRA in th[e] case, were first required to file an appeal to the Board of Appeals and obtain a final administrative decision prior to seeking judicial review in the [trial c]ourt." In other words, this Court determined that the trial court correctly dismissed the appellants'—non-DRRA parties'—action based on the appellants' "failure to exhaust an available and exclusive administrative remedy." Id. at 311, 855 A.2d at 328. In Queen Anne's Conservation, id. at 308-09, 322, 855 A.2d at 326, 334, this Court referenced "public benefits" on two occasions. In the introduction to the opinion, we stated:

> []DRRAs[] are a relatively recent addition to the Maryland toolbox of land use and development implements approved by the [General Assembly] for possible use by many local political subdivisions and the legal or equitable owners of real properties desiring to develop their properties. Although many states, such as California in 1979, preceded Maryland in recognizing the use of DRRAs or their equivalents, [the General Assembly] lingered until 1995 before enacting [the DRRA statute]. The legislation seems to be the result of the balancing of developers' and property owners' desires for a larger measure of certainty than that offered by proceeding to market through the traditional development processes, while risking the monetary investment to develop their property, against local governments'

- 42 -

desire to receive **greater public benefits** on a more predictable schedule than might otherwise be attainable through the traditional processes.

Id. at 308-09, 855 A.2d at 326 (emphasis added) (footnote and citations omitted). And, later in the opinion, in explaining one of the reasons why we disagreed with the contention "that a determination by the governing body of the local jurisdiction as to what terms, conditions, restrictions or other requirements are necessary to ensure the public health is the 'very essence' of the legislative function performed by local elected officials[,]" we stated:

> First, the negotiation of terms protective of public health, safety, or welfare, in a contract entered into by a local government body is a discretionary executive act, not a legislative one. *See Montgomery County v. Revere Nat'l Corp., Inc.*, 341 Md. 366, 390, 671 A.2d 1, 12 (1996) ("When the executive branch of the county government, in carrying out the laws and functions of government, enters into a contract, such action constitutes the exercise of executive discretion."). A DRRA is not an ordinance or legislation as those terms are commonly understood; rather, it is a contract whose purpose is to vest rights under zoning laws and regulations, in consideration of **enhanced public benefits**.

Queen Anne's Conservation, 382 Md. at 321-22, 855 A.2d at 334 (emphasis added).

As an initial matter, reading the opinion leads to the conclusion that the references to "greater public benefits" and "enhanced public benefits" in Queen Anne's Conservation are nothing more than references to the fact that a local governing body may desire "greater public benefits" and that a local governing body may bargain for "enhanced public benefits" as consideration in a DRRA. In Queen Anne's Conservation, the term "enhanced public benefits" is not defined or described in any manner. There is no reference to the DRRA statute or legislative history requiring enhanced public benefits as consideration in a DRRA. Simply put, the references to enhanced public benefits and greater public benefits

- 43 -

in Queen Anne's Conservation fall far short of a holding that a DRRA must be supported by enhanced or greater public benefits—*i.e.*, that a DRRA must consist of an enhanced public benefit to the county conferred by the developer. Indeed, the statements about "greater public benefits" and "enhanced public benefits" are *dicta*. In Queen Anne's Conservation, id. at 310-11, 855 A.2d at 327-28, this Court's holding concerned a procedural matter as to whether the appellants challenging a DRRA, who were not parties to the agreement, had exhausted administrative remedies prior to seeking judicial review in the trial court. Nothing in Queen Anne's Conservation purported to address, let alone analyze, what contents are required for a DRRA to be valid, or whether LU § 7-303(a) requires enhanced public benefits. In other words, the references to "greater public benefits" and "enhanced public benefits" "were neither part of nor essential to the holding[] in the [] case[] and therefore constitute mere *obiter dicta*[.]" Silbersack v. ACandS, Inc., 402 Md. 673, 683, 938 A.2d 855, 860 (2008).

Additionally, in Queen Anne's Conservation, 382 Md. at 322, 855 A.2d at 334, the reference to "enhanced public benefits" must be read in the context of the paragraph in which the term appears. In the sentence preceding the sentence that includes the term "enhanced public benefits," the Court stated: "First, the negotiation of terms protective of public health, safety, or welfare, in a contract entered into by a local government body is a discretionary executive act, not a legislative one." Id. at 321, 855 A.2d at 334 (citation omitted). This sentence states that the ability to enter into, and negotiate the terms of, a DRRA is a discretionary executive act, insofar as the terms concerning the public health, safety, or welfare. Our remarks in Queen Anne's Conservation would be inconsistent if

- 44 -

we were to announce, on the one hand, that the ability to enter into a DRRA and to negotiate terms related to the public health, safety, or welfare are discretionary executive acts, but mandate, on the other hand, that a local governing body must obtain enhanced public benefits as a requirement for a DRRA—*i.e.*, that enhanced public benefits are necessary to the public health, safety, or welfare, and that, as such, the local governing body must negotiate and obtain enhanced public benefits.

In Casey, 231 Md. App. at 378, 151 A.3d at 46-47, the Court of Special Appeals held that a DRRA did not include unlawfully broad language purporting to freeze local laws beyond that authorized by LU § 7-304, and that the BOCC made all required factual findings justifying the grant of PUD zoning. In Casey, id. at 380, 392, 151 A.3d at 48, 55, the Court of Special Appeals referenced "public benefits" on three occasions. In discussing the freeze provision of the DRRA statute, the Court of Special Appeals explained:

> Obtaining forbearance of the application of subsequent changes in relevant local laws provides certainty and stability to developers, whose projects may take many years to complete and/or sell-off or lease. Local governments derive, in return, negotiated **greater public benefits** than may be attained through typical governmental exactions or conditions of development approvals.

Id. at 380, 151 A.3d at 380 (emphasis added). And, later in the opinion, immediately after quoting the House Commerce and Government Committee's bill analysis of House Bill 700—specifically, the language that "[f]or the local government, the development agreement provides for greater certainty in the comprehensive planning process, as well as an opportunity to ensure the provision of necessary public facilities"—the Court of Special Appeals stated:

- 45 -

What would achieve best the legislative purpose of balancing a developer's interest in legal stability against a local government's interest in certainty and obtaining **enhanced public benefits**; limiting, for example, the Casey DRRA's freeze provision to subsequent changes in the zoning code only, as urged by [the petitioner], or allowing it to apply to the expansive list of local provisions in the negotiated DRRA as written? If the DRRA [statute] only allowed DRRAs to freeze the application of local zoning ordinance provisions, a local government could undermine still the legal and financial stability of an on-going development project by changing the laws related to, for example, development or site plans, subdivision, or planning compliance. Where a developer assumed that its project could be thwarted by a last-minute or mid-stream change to any of these non-zoning laws, it would be less likely to undertake a substantial development at all in a jurisdiction. This, in turn, would frustrate the local government's interest in obtaining **greater public benefits** through negotiation of a DRRA's terms.

Id. at 392, 151 A.3d at 55 (emphasis added).

First, to the extent that, in Casey, 231 Md. App. at 392, 151 A.3d at 55, the Court of Special Appeals read the DRRA statute's legislative history as providing that a local governing body must obtain enhanced public benefits, such a reading is mistaken. To be sure, both the House Commerce and Government Committee and the Senate Economic and Environmental Affairs Committee recognized, in their respective bill analyses, that a benefit of a DRRA to the local government is that a DRRA "provides for greater certainty in the comprehensive planning process, as well as an opportunity to ensure the provision of necessary public facilities." As we explained above, however, the Committees' statements about the benefit to the local government concern only a local government's ability to ensure the provision of "necessary public facilities," and not the local government's ability to ensure "enhanced public benefits." And, nothing in the Committees' statements even suggests that "necessary public facilities" was intended to be the equivalent of "enhanced public benefits" or that there was a requirement that a

- 46 -

developer confer enhanced public benefits to a local governing body. Put simply, neither Queen Anne's Conservation nor Casey changes our holding that a DRRA is not required to be supported by enhanced public benefits.[10]

Second, the Court of Special Appeals's statements in Casey referencing "greater public benefits" and "enhanced public benefits" are *dicta*. In Casey, 231 Md. App. at 378, 381, 151 A.3d at 46-47, 48, the Court of Special Appeals's holdings concerned the freeze provision of a DRRA and of LU § 7-304, and whether the BOCC made the requisite findings for approving PUD zoning. As in Queen Anne's Conservation, nothing in Casey purported to address and decide the issues of what requirements a DRRA must include, and whether LU § 7-303(a) requires enhanced or greater public benefits. In other words, as in Queen Anne's Conservation, the references to "greater public benefits" and "enhanced public benefits" in Casey "were neither part of nor essential to the holdings in the [] case[] and therefore constitute mere *obiter dicta*[.]" Silbersack, 402 Md. at 683, 938 A.2d at 860. We do not consider the references in Casey to "greater public benefits" and "enhanced public benefits" either precedential or persuasive as to whether the General Assembly intended to require that a DRRA be supported by enhanced public benefits.

Having determined that a DRRA is not required to confer enhanced public benefits on a county to be valid, we turn to the issue of whether the Blentlinger DRRA is supported

---

[10]Interestingly, the opinion in Queen Anne's Conservation was authored by the Honorable Glenn T. Harrell, Jr., while an incumbent member of this Court, and the opinion in Casey also was authored by Judge Harrell, in his capacity as a specially assigned senior judge. This could, perhaps, account for the repetition and use of the terms "greater public benefit" and "enhanced public benefit" in Queen Anne's Conservation and in Casey.

by sufficient consideration. We hold that it is. As an initial matter, contrary to Cleanwater's and the County's contentions, we know of no statute or case law requiring a DRRA's requirements to exceed requirements of a related PUD ordinance. In our view, a PUD ordinance and a DRRA are often a "package deal," so it would seem commonsensical that the requirements of the two would largely mirror one another. And, we know of nothing that dictates that a DRRA's requirements must somehow exceed that of a PUD ordinance, or of any other regulation or local law. Simply put, we are unpersuaded by the argument that the Blentlinger DRRA is somehow void for lack of consideration on the basis that the Blentlinger DRRA's requirements are also required by the PUD Ordinance and other regulations and local laws, such as the APFO.

The consideration bestowed upon the BOCC, *i.e.*, the County, in the Blentlinger DRRA is sufficient. As we have explained, "consideration may be established by showing a benefit to the promisor or a detriment to the promisee." Cheek, 378 Md. at 148, 835 A.2d at 661 (citation and internal quotation marks omitted); see also Forty W. Builders, Inc., 178 Md. App. at 384-85, 941 A.2d at 1213 ("In Maryland, consideration may be established by showing a benefit to the promisor or a detriment to the promisee." (Citation and internal quotation marks omitted)). And, in Vogelhut, 308 Md. at 191, 517 A.2d at 1096, we explained:

> A benefit to the promisor or a detriment to the promisee is sufficient valuable consideration to support a contract. Legal detriment means giving up something which immediately prior thereto the promisee was privileged to retain, or doing or refraining from doing something which he was then privileged not to do, or not to refrain from doing.

(Citations and internal quotation marks omitted). Additionally, "[a] promise [may be]

consideration for another promise [where] it constitutes a binding obligation." Cheek, 378 Md. at 148, 835 A.2d at 661.

Here, there were both benefits to the County and detriments to Petitioners, as well as binding promises on Petitioners' part, that constitute sufficient consideration for the County's entering into the DRRA, which guarantees vesting of rights. As to benefits to the County and detriments to Petitioners, in Section 2.2A of the Blentlinger DRRA, concerning development limitations, Petitioners agree to develop no more than 675 residential dwelling units—*i.e.*, Petitioners agree that the maximum number of residential dwelling units permitted on the Property is 675. Pursuant to FCC § 1-19-10.500.6(H)(1)(a), however, a property that is designated as LDR in the Frederick County Comprehensive Plan may contain three to six dwelling units per acre. Thus, a maximum of 1,674 dwelling units could be permitted for the Property with the PUD zoning; and, by agreeing to limit the project to 675 residential dwelling units, Petitioners are relinquishing the right to pursue development of 999 additional residential dwelling units, or, at a minimum, the right to pursue development of 45 additional residential dwelling units, as Petitioners originally sought to develop 720 residential dwelling units. Clearly, this is a detriment to Petitioners, and the County benefits by limiting the number of residential dwelling units on the Property.

In Section 2.2E of the Blentlinger DRRA, Petitioners agree that, "with the exception of structures on the Public School Site and models for the Project, . . . neither Frederick County, nor any agency, department, division and/or branch thereof shall issue any structural building permits, prior to January 1, 2020." Thus, as of the time of execution of

the Blentlinger DRRA, Petitioners agreed to wait a period of just over five years before seeking building permits. In other words, Petitioners agreed to forego the right to seek structural building permits that they might otherwise have been entitled to seek but for the terms of the Blentlinger DRRA. Like the agreement to limit the number of residential dwelling units, the agreement to a limitation on the issuance of structural building permits obviously constitutes a detriment to Petitioners and effectively prevents them from proceeding with building up the development until January 1, 2020.

Moreover, the Blentlinger DRRA includes a plethora of binding promises by Petitioners that evidence consideration for the DRRA. For example, in Section 3.1 of the Blentlinger DRRA, to satisfy APFO requirements for the project, Petitioners agree "to either construct or fund the construction of certain road improvements or contribute to escrow funds for road improvements, all as will be comprehensively set forth in an [APFO] Letter of Understanding[.]" In Sections 3.2 and 3.3, Petitioners agree to comply with the sewer and water improvements required by the APFO Letter of Understanding, and to pay tap fees in accordance with the fee schedule in effect at the time of building permit application. In Section 3.4A, Petitioners agree to pay the school construction fee as a condition of APFO approval for the project at Phase II, notwithstanding the sunset of a school construction fee ordinance. And, pursuant to Section 3.4B, Petitioners agree that all "[a]pplicable [s]chool [i]mpact [f]ees shall be paid at the time of the issuance of building permits in accordance with the fee schedule in effect at the time of the issuance of building permits."

As to property acquisition for public infrastructure, in Section 3.5A, Petitioners

agree to "exercise commercially reasonable efforts to secure [a third party's] right-of-way without the assistance of [Frederick] County" in the event that such acquisition is necessary. In Section 3.5B, Petitioners agree that, if they demonstrate that they are unable to secure a public right-of-way through commercially reasonable efforts, then they may request that the County or the State Highway Administration assist in such acquisition at their "sole cost and expense." And, in Section 3.5C, Petitioners agree that, if the County decides not to acquire the right-of-way, or the two-year time period of assistance has passed, then Petitioners "may be permitted to make a contribution to the County equal to the entire anticipated project development costs, which shall include but not be limited to costs for: design, engineering, right-of-way acquisition, management, inspection, etc. in lieu of constructing the public infrastructure improvements[,]" unless the applicable APFO letter of understanding provides otherwise.

Additionally, in Section 7.1B, Petitioners waive the right to a "trial by jury in connection with any proceedings brought to enforce the terms of" the Blentlinger DRRA should they breach the terms of the DRRA and the BOCC is forced to bring a legal action for damages. In Section 8.3, concerning fees, Petitioners agree that, except as otherwise provided in the Blentlinger DRRA, they "shall pay all fees (specifically including but not limited to impact fees, school mitigation fees and water and sewer connection fees) required by Frederick County at the rate in effect at the time the fee is due."

Finally, significantly, we conclude that the proffer of the middle school site is a conditional promise that constitutes sufficient consideration. In Section 3.4C, entitled "[s]chool [s]ite [d]edication," Petitioners agree to convey, at no cost, approximately 24.5

acres of the Property to the BOE for a middle school site; specifically, Section 3.4C

provides, in relevant part:

> [Petitioners] shall convey in fee simple to the []BOE[], with no monetary consideration paid, the Public School Site shown on **EXHIBIT 6**, totaling a minimum of 24.5 ± buildable acres, to serve the Project and the surrounding region.  The Public School Site will be conveyed to the BOE upon: i) the recordation of the first subdivision plat for lots in the Project; and ii) BOE's acceptance of the conveyance of land for the Public School Site. . . . A separate Memorandum of Understanding ("BOE MOU") between the BOE and [Petitioners] shall be executed prior to unconditional Phase II approval for residential dwelling units in the Project (assuming commercially reasonable efforts by both parties), which MOU shall establish and control other aspects of the Public School Site and the rights and responsibilities of the parties relative to the Public School Site, and the construction of a public school. . . . In the event that the BOE does not approve the Public School Site or determines not to accept conveyance of the Public School Site, then [Petitioners] shall retain fee simple ownership of the Public School Site, and may use the Public School Site in a manner consistent with other uses with the Project.  [Petitioners] acknowledge[] that use of the Public School Site may require regulatory approvals, including but not limited to, revision of the [PUD] Ordinance.

(Emphasis in original).

As an initial matter, we note that LU § 7-303(a) does not require that a DRRA

include dedication of a portion of the real property for public use.  Rather, as provided in

LU § 7-303(a)(10)(i), a DRRA shall include "to the extent applicable, provisions for the[]

dedication of a portion of the real property for public use[.]"  (Paragraph break omitted).

Similarly, FCC § 1-25-4(A)(11)(a) provides that a DRRA shall include, "[t]o the extent

applicable, provisions for the[ d]edication of a portion of the property for public use[.]"

(Paragraph break omitted).  In other words, under the DRRA statute and County ordinance,

dedication of a portion of the property for public use is a requirement of a DRRA only "[t]o

the extent applicable"—*i.e.*, such dedication is not required as a matter of course with every

DRRA. In other words, a DRRA could be valid under both State and County law without the dedication of land for public use.

Relevant here, FCC § 1-19-10.500.8(B), concerning public facilities, other than parks and recreation facilities, within PUD districts, provides: "The County Council [formerly, the BOCC] may require additional sites for other public facilities including schools, library services, or a fire and emergency medical service site to serve the proposed development where the County Council determines that a need exists based on established county standards of service." An applicant for PUD zoning is not required to proffer a school site or other public facility site to obtain PUD zoning; rather, as FCC § 1-19-10.500.8(B) demonstrates, the County Council, formerly, the BOCC, has the discretion to require such additional sites for public facilities such as schools where it determines that a need exists. Reading these statutory provisions together leads to the conclusion that LU § 7-303(a)(10)(i) and FCC § 1-25-4(A)(11)(a) are not automatically applicable to all DRRAs, as those provisions expressly state that only "to the extent applicable" shall a DRRA include provisions for the dedication of a portion of the property for public use; and under FCC § 1-19-10.500.8(B), the BOCC had the discretion to require the designation of a portion of the Property for public use, but was not required to do so. Simply put, under the relevant statutes, the Blentlinger DRRA was not required as a matter of course to include dedication of a portion of the Property for the middle school site. Nevertheless, despite not being required for the PUD Ordinance or the DRRA, Petitioners proffered the middle school site, and the proffer was incorporated into the Blentlinger DRRA.

Specifically, in Section 3.4C of the Blentlinger DRRA, Petitioners agree to convey

in fee simple to the BOE, at no cost, the middle school site consisting of approximately 24.5 acres upon two conditions subsequent—the recordation of the first subdivision plats for lots in the project, and the BOE's acceptance of the conveyance of the land for the middle school site. Thus, the conveyance of the middle school site rests on the BOE's acceptance or rejection of the site. This, however, does not make Petitioners' conditional promise of the middle school site "illusory," as alleged by Cleanwater and the County. As we explained in Cheek, 378 Md. at 149, 835 A.2d at 662, "[i]f A makes an illusory promise, A's words leave A's future action subject to A's own future whim, just as it would have been had A said nothing at all." (Citation and internal quotation marks omitted). Here, Petitioners have no control over whether the BOE will accept or reject the middle school site, and their future action—either conveying the middle school site in fee simple to the BOE or retaining fee simple ownership of the site for use in a manner consistent with other uses with the project—is not subject to their own determination. If the BOE accepts the middle school site, Petitioners' performance is mandatory; in Section 3.4C, Petitioners have expressly promised the middle school site if the BOE accepts it, and Petitioners will be required to deliver fee simple ownership of the middle school site under those circumstances. The proffer of the middle school site is valuable consideration for the Blentlinger DRRA.

In sum, we conclude that the Blentlinger DRRA—indeed, any DRRA—is not required to confer enhanced public benefits to the local governing body, *i.e.*, the County, to be valid; that the Blentlinger DRRA is supported by sufficient consideration; and that the Court of Special Appeals erred in concluding that the Blentlinger DRRA was void for

lack of consideration.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY. RESPONDENTS TO PAY COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS.**